## CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY ET AL. *v.* MINNEAPOLIS CIVIC AND COMMERCE ASSOCIATION.

ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

No. 283. · Argued May 1, 2, 1918.—Decided June 10, 1918.

Two railroad companies, between them owning all the stock and controlling completely the property and operations of a third company, which had legal title to terminal tracks, caused separate switching charges to be made in its name on traffic moved by them over those tracks, although for substantially the same service over terminals which each owned separately, neither made any charge in addition to its line-haul rates. A state commission, finding that the practice discriminated against shippers on the third company's tracks, ordered that the separate charges be discontinued and that the tracks be operated as a part of the terminal properties of the other companies, in intrastate traffic. *Held:* (1) Upon examination of the findings and evidence, that the commission and the courts below were justified in holding the third company a mere agency or instrumentality of the other two; (2) that its technical corporate individuality and its technical ownership of the tracks in question did not entitle it to be treated as an independent carrier, and that the order did not deprive it or the other companies of property without compensation or due process of law; (3) that the order imposed no unlawful burden on interstate commerce.
134 Minnesota, 169, affirmed.

THE case is stated in the opinion.

*Mr. James B. Sheean* and *Mr.  W. Dynes*, with whom *Mr. F. W. Root, Mr. William H. Norris* and *Mr. Edward M. Hyzer* were on the briefs, for plaintiffs in error.

. *Mr. Frank J. Morley,* with whom *Mr. Clifford L. Hilton,* Attorney General of the State of Minnesota, and

*Mr. Lyndon A. Smith* were on the briefs, for defendant in error.

MR. JUSTICE CLARKE delivered the opinion of the court.

We shall adopt the designation of the parties which is used in the record: the Chicago, Milwaukee & St. Paul Railway Company as the "Milwaukee Company;" the Chicago, St. Paul, Minneapolis & Omaha Railway Company as the "Omaha Company;" the Minneapolis Eastern Railway Company as the "Eastern Company;" the Minneapolis Civic and Commerce Association as the "Civic Association," and the Railroad & Warehouse Commission of the State of Minnesota as the "Commission."

This proceeding originated in a petition filed by the Civic Association with the Commission against the three railway corporations plaintiffs in error, in which it is alleged that the tracks of the Eastern Company are mere switching or terminal facilities, in the City of Minneapolis, of the Milwaukee and Omaha companies, and that an unreasonable extra charge is made for the receipt and delivery of cars over them. The prayer is that the plaintiffs in error be required to treat the tracks of the Eastern Company as if they were a part of the terminal systems of the Milwaukee and Omaha companies, and that they be required to publish and maintain fair and reasonable tariffs applicable to traffic moving over them.

A hearing upon this petition resulted in findings of fact by the Commission, among others: that the Eastern Company was then operating only one mile of main track and one mile and a half of yard track and sidings in the City of Minneapolis; that the Milwaukee and Omaha Companies each owned one-half of its capital stock and were in control of its operations; and that, assuming to be

an independent railroad company, the Eastern Company had filed tariffs with the Interstate Commerce Commission and with the Minnesota Commission, pursuant to which it was charging and collecting, in addition to the line rate from point of origin, an extra charge of $1.50 per car for inbound loaded cars and ten cents per ton, with a minimum of $1.50 per car, for outbound loaded cars, moving over its tracks.

As conclusions of law the Commission found that the tracks of the Eastern Company were a part of the terminal property of the Milwaukee and Omaha companies; that it was the legal duty of these companies to deliver cars to and to receive them from industries on the tracks of the Eastern Company without charge other than that made for the line haul; and that the extra charge which the Eastern Company was making resulted in discrimination against inbound shippers of grain to industries located upon its tracks.

Upon these findings of fact and conclusions of law the Commission entered an order, requiring that the three companies cease charging $1.50 per car for inbound shipments over either the Milwaukee or Omaha lines which are delivered over the Eastern Company's tracks to industries located upon them or to connecting carriers; that the Eastern Company cease from charging any sum for delivering carload shipments of freight moving from connecting carriers to the Milwaukee or Omaha companies, or moving from mills and elevators located on the Eastern Company's tracks to the Milwaukee or Omaha companies; and that the Omaha and Milwaukee companies in the future shall operate the tracks of the Eastern Company as a part of the terminal property of each of them in the City of Minneapolis. The order is made applicable only to intrastate shipments of freight.

On appeal to a state district court the order of the Commission was affirmed and adopted as the order of the

court, and the decision of the Supreme Court of Minnesota affirming this judgment is now before us for review.

The contention of the railway companies in this court is stated by them "to be reduced to the single proposition:" That the Supreme Court of Minnesota erred in affirming the judgment of the District Court in finding, as did the Commission, that "the tracks operated by the Eastern Company are important, convenient and necessary terminal facilities of the Milwaukee and Omaha companies, and that these companies directly control and operate the Eastern Company;" and in adjudging, "that the Milwaukee and Omaha companies be required to operate the Eastern Company's tracks as a part of their terminal property at Minneapolis, without making any extra charge for moving traffic over them."

Review by this court is prayed for on the ground that to give effect to the judgment and order of the Minnesota court will deprive each of the three railroad companies of its property without compensation and without due process of law, in violation of the Fourteenth Amendment to the Constitution of the United States, and, earnestly insisting that the findings of fact upon which the judgment proceeds are without support in the evidence, the plaintiffs in error urge that it be determined from the entire record before us whether substantial evidence was introduced to sustain the denial of their claimed federal right. *Interstate Amusement Co.* v. *Albert*, 239 U. S. 560, 566; *Jones National Bank* v. *Yates*, 240 U. S. 541, 552.

Thus, the question presented for our decision is whether the Eastern Company, in form a corporate entity, separate and distinct from the Milwaukee and Omaha companies, is in reality an independent carrier, exercising an independent control over the railroad to which it holds the legal title and over the conduct of its business affairs, or whether it is a mere agency or instrumentality of the two corporations, which own all of its capital stock,

through which they collect an extra charge from the
public for rendering by indirection a service which as
common carriers they are legally required to render
without such charge under the conditions of operation
which prevail at Minneapolis.

It is obvious that this is a mixed question of fact and of
law, and from the findings of fact as made by the Commis-
sion and by the District Court, which differ only in
unimportant details, and from evidence undisputed in the
record, we derive the following statement, which we think
embraces all that is essential to a decision of the case.

The Eastern Company is a Minnesota corporation,
with an authorized capital stock of one million dollars,
organized in 1878 for the declared purpose of building and
operating a railroad from the City of Minneapolis to the
City of St. Paul, with branches connecting with all rail-
roads now built or hereafter to be built to or into said
cities, and with branches to the mills and manufacturing
establishments located therein.

The formal organization of the company was by a group
of mill-owners, but before any right of way was acquired
or construction work done the Milwaukee and Omaha
companies came into exclusive control of the corporation
and a board of directors satisfactory to them was elected,
with the result that the only road which the company
ever built or operated (omitting small fractions) was one
mile of main track and one mile and a half of yard track
and sidings in the City of Minneapolis. At the time of
the trial the Eastern Company served several mills and
warehouses and one elevator, it had no stations or freight
depots, its only rolling stock was two engines, and the
average number of its employees varied from twenty to
thirty men. Its tracks are used for interchange by the
Milwaukee and Omaha lines, but other companies use
them for this purpose to such a limited extent, that the
part of the Commission's order relating to such use is

neglected in the evidence and arguments and in the decisions of the state courts.

Almost immediately after the organization of the Eastern Company, the three companies entered into a written contract, effective for over 39 years, until May 1, 1918, which is of much significance in determining the decisive fact in the case, as we have stated it.

This contract provides:

(1) That only 300 shares of the authorized 10,000 shares of capital stock of the Eastern Company shall be issued, and of these, 75 shares each must be issued to the Omaha and Milwaukee companies, 145 shares to a trustee for the Eastern Company, and the remaining 5 shares shall be issued as qualifying shares to directors. The 145 trust shares "shall not be transferable except by the written consent of all (3) said parties hereto, and any transfer thereof without such consent shall be void and of no force or effect."

(2) The Eastern Company shall execute in proper form 150 bonds of $1,000 each and a mortgage on all the property and franchises of the company to secure their payment. The Milwaukee and Omaha companies agree each to purchase, at 80% of their par value, one-half the amount of such of these bonds as it may be necessary to issue to pay for the right of way, construction and equipment of the railroad;

(3) That the Milwaukee and Omaha companies shall have "equal and the same rights in and to the said railway . . . in all respects;" that they shall pay the same charge for switching their respective cars by said railway, and that no partiality or favor shall be shown to either;

(4) That the superintendent having charge of the operation of the railroad, shall be appointed "by the consent and mutual agreement of all the parties to these

(5) That the Eastern Company shall charge all parties one dollar for switching each loaded car, but a rebate of fifty per cent. of this charge shall be made to the Milwaukee and Omaha companies;

(6) If any other company having equal facilities with the Eastern Company for reaching mills in Minneapolis shall promptly and satisfactorily do the switching for the second and third parties (the Milwaukee and Omaha companies) then the Eastern Company with the written consent of the Omaha and Milwaukee companies, will do switching for such railroad companies over the said railroad of the Eastern Company on the same terms that switching is done for the said second and third parties (the Milwaukee and Omaha companies) over such other railroad but without rebate to any company.

It is quite true, as is argued, that some of the provisions of this contract have been departed from, and that others have been rendered unlawful and void by statutes enacted, and by decisions of courts rendered, since its date. But this does not lessen its evidential value in determining whether the interest of the Milwaukee and Omaha companies in the Eastern Company was that of mere stockholders in an independent public service corporation or whether they intended to and did exercise the power which they possessed as stockholders to immediately and directly control the property and the conduct of the business of the Eastern Company.

Whether because the Milwaukee and Omaha companies distrusted each other or for other cause, it is plain that this contract was designed to take away from the Board of Directors of the Eastern Company, the usual and lawful governing body of a corporation, the normal legal control of the company's affairs in several most important respects. It deprived the Board of the power: to issue the capital stock of the company and to finance its affairs; to select a superintendent to operate the company's two

and one-half miles of track, by requiring that such selection be made only with the consent and mutual agreement of the three companies; to make mutual agreements for the interchange of business with any other company except with the mutual consent of the Milwaukee and Omaha companies; and it renders one-half (save five shares) of the stock which it permits to be issued, transferable only with the written consent of the Milwaukee and Omaha companies. Thus, the making of this contract was an obvious surrender by the Eastern Company of substantially all freedom of corporate action and an assumption of control over that company by the Milwaukee and Omaha companies, which converted it largely into a mere agency or instrumentality for doing their bidding.

That this preliminary program of control was carried forward to realization is abundantly shown by the record.

An accumulated surplus of $95,000 was distributed by the Eastern Company in the form of stock dividends in 1906, by dividing it equally between the Milwaukee and Omaha companies, and when the original seven per cent. loan of $150,000 was refunded into a four and one-half per cent. loan the new bonds were taken equally by the two companies. Thus the equal interest of the two owning companies and the financial dependence of the Eastern Company were maintained.

The management and control of all the operations of the Eastern Company has always been kept in charge of a "Managing Committee" of two members, one of whom for many years before the evidence was taken was the general manager of the Omaha Company and the other the general superintendent of the Milwaukee Company. The Eastern Company did not pay either of these men any salary for their services.

The auditor of the Omaha Company has been the auditor of the Eastern Company, which paid no part of

his salary, and the established practice has long been for the one bookkeeper of the Eastern Company to take his journal and ledger to the auditor of the Omaha Company monthly for verification.

Seven of the nine directors of the Eastern Company at the time the evidence was taken were officers either of the Milwaukee or Omaha company; the eighth, the attorney of the Eastern, had desk room in the Milwaukee Company's legal department, of which he had recently been a member; and the ninth director, the president, was not an employee of either of the two owning companies.

With the facts thus summarized, it is difficult to conceive of a plan for the control of a jointly owned company and for the operation of a jointly owned track more complete than this one is and it is sheer sophistry to argue that, because it is technically a separate legal entity, the Eastern Company is an independent public carrier, free in the conduct of its business from the control of the two companies which own it and therefore free to impose separate carrying charges upon the public.

The record further shows that the Milwaukee and Omaha companies separately own many tracks in Minneapolis, on which large mills and elevators are located and that they render to such industries "substantially the same service" as is required in delivering and receiving cars to and from like industries on the Eastern Company's track for which they make no charge whatever in addition to the line-haul rate. The general manager of the Omaha Company, who was one of the two members of the "Managing Committee" of the Eastern Company, testifies that the line-haul rate to Minneapolis on the Omaha line "includes switching to any industry on its tracks" in that city regardless of the relative distance or expense of such delivery; that this rule prevails at all points on the Omaha line; that, generally

speaking, this is the custom of all railroads, and that if the Eastern tracks were exclusively owned by the Omaha Company deliveries to and from industries located upon them would be made without any switching charge additional to the line-haul rate. The Milwaukee Company also delivers on tracks exclusively owned by it at Minneapolis, without charge additional to the line-haul rate.

The Eastern Company, assuming the character of an independent common carrier, pursuant to tariffs filed, collects the switching charge, which is objected to, of $1.50 per car on inbound loaded cars and a charge of ten cents per ton, with a minimum charge of $1.50 per car on outbound loaded cars, which move over its tracks, in addition to the line-haul rate. But the practice of the Milwaukee and Omaha companies (with negligible exceptions) is to "absorb" this extra charge made against outbound cars, so that as both the Commission and the Court find, "from a practical standpoint shippers on inbound grain are the only persons who have to pay the charge" of the Eastern Company.

The Eastern Company does not issue bills of lading and does not make any collection from shippers, but charges its switching rate against the Omaha and Milwaukee companies, and it is paid by them from the line-haul rate on outbound traffic, and from the line-haul rate plus the switching charge, which they also collect, on inbound grain. Under such a system of doing business, the controversy in the case really relates only to the charge of the Eastern Company on inbound grain, for as to all other traffic the charge by the Eastern Company is simply a bookkeeping one which does not involve any extra switching charge to the shipper. Thus, the charge of the Eastern Company, when paid by the shipper in addition to the line-haul rate, is obviously a discrimination against industries located on the Eastern Company's

tracks when compared with those similarly situated on other industrial spur delivery tracks which are wholly owned by either company.

This discussion of the evidence in the case renders it very clear that the purpose of the Milwaukee and Omaha companies from the beginning was to construct and operate but one track to the group of industries to be served, instead of each building and maintaining its own track, and to construct and use that track in common so that each might have the benefit of it as fully as if it were the sole owner. To accomplish this end they resorted to the familiar device of incorporating the Eastern Company, and in order that their purpose might not be defeated in the future, by the design or business necessity of either company, the contract between them which we have discussed, was entered into to prevent the corporate organization of the Eastern Company and the control of its operations from being changed by either owning company without the consent of the other, and the evidence makes it very clear that all through its corporate life the Eastern organization has been consistently used as a mere agency of the two owning companies to accomplish their original purpose.

Much emphasis is laid upon statements made in various decisions of this court that ownership, alone, of capital stock in one corporation by another, does not create an identity of corporate interest between the two companies, or render the stockholding company the owner of the property of the other, or create the relation of principal and agent or representative between the two: *Pullman's Palace Car Co.* v. *Missouri Pacific Ry. Co.*, 115 U. S. 587; *Peterson* v. *Chicago, Rock Island & Pacific Ry. Co.*, 205 U. S. 364, 391; *United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, 413; *Interstate Commerce Commission* v. *Stickney*, 215 U. S. 98, 108; and *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238

U. S. 516, 529, 530, and it is argued that since the order of the Commission requires that the tracks, the title to which is in the Eastern Company, be treated as the property of the stock owning companies, the effect of it, if enforced, will be to deprive the Eastern Company of its property without compensation and to render valueless its capital stock owned by the Milwaukee and Omaha companies.

While the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies. *United States* v. *Lehigh Valley R. R. Co.*, 220 U. S. 257, 273, and *United States* v. *Delaware, Lackawanna & Western R. R. Co.*, 238 U. S. 516. In such a case the courts will not permit themselves to be blinded or deceived by mere forms or law but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require.

Satisfied as we are by the evidence that the Eastern Company is a completely controlled agency of the two companies which own its capital stock, we agree with the Supreme Court of Minnesota that the fact that the legal title to what are obviously terminal or spur delivery tracks is in the Eastern Company should not be permitted to become the warrant for permitting a charge upon shippers greater than they would be required to pay if that title were in the owning companies. The order of the Commission affirmed by the Supreme Court of Minnesota, so far from being arbitrary, is plainly just, and clearly it does not deprive the plaintiffs in error of their

property without compensation or without due process of law, by requiring, as it does, that for ratemaking purposes the Milwaukee and Omaha companies shall extend to shippers over their tracks the legal title to which is in the Eastern Company, equality of treatment with that which they give to shippers over their separately owned tracks, where similar service is rendered.

The claim that an unlawful burden is imposed upon interstate commerce by requiring that the one delivery track here involved shall be treated with respect to intrastate traffic precisely as many other similarly used and situated tracks have always been treated by the owning companies is too unsound to merit consideration.

The judgment of the Supreme Court of Minnesota is

*Affirmed.*