## SUDDUTH v. STORM KING COAL CO. et al.

(Circuit Court of Appeals, Sixth Circuit. November 12, 1920.)

No. 3411.

1. **Contracts ⬳10(4)—Corporations ⬳458—Contract for sale of stock and assets not invalid, as unilateral.**

   A contract for the sale by a corporation of all its capital stock and assets, reciting a consideration of $100, and providing for payment by the purchaser of $45,000 in the manner therein stated, *held* not unilateral, or even an option contract, and not invalid.

2. **Contracts ⬳93(5)—Mistake of one party held not to prevent enforcement.**

   Where one of the parties to a contract was not mistaken as to its terms and is not charged with fraud, the mistake of the other parties as to the consideration provided is not a defense to a suit for enforcement of the contract.

3. **Corporations ⬳458—Evidence held to show no mistake in contract for sale of stock and assets.**

   Evidence *held* insufficient to show that a contract for the sale of all the stock and assets of the corporation was executed by the corporation's officers under a mistake as to the amount of consideration provided.

4. **Corporations ⬳458—Negligent mistake as to consideration of contract does not entitle party to relief.**

   Where an officer of a corporation, signing a contract for the sale of its stock and assets, had a full and fair opportunity to examine it in detail, his mistaken belief as to the consideration provided was due to his own negligence, and does not justify relief in equity, unless the mistake was a mutual mistake of all parties.

5. **Corporations ⬳458—Contract held one for purchase of all capital stock and assets.**

   A contract by a close corporation owned by three men, who managed its business informally and two of whom signed the contract as officers, by which it agreed to transfer all shares of its capital stock and deliver possession of a mining lease and improvements, *held* a contract for the sale of all its capital stock and assets, and not merely the stock issued to the stockholders.

6. **Equity ⬳56—Disregards form and looks to substance.**

   A court of equity is not concerned with outward forms, but will disregard form and look to the substance of every transaction.

7. **Corporations ⬳116—Purchase price of corporation's property is sufficient consideration for agreement to transfer stock.**

   The payment to a corporation of the purchase price of all its property is a sufficient consideration for the agreement of its stockholders to transfer their stock to the purchaser.

8. **Corporations ⬳116—Officers signing corporation's agreement for sale of stock and assets bound by agreement as to their stock.**

   Stockholders who, as officers, signed a corporation's contract for the sale of all its property and stock, could not deny their consent to the transfer of their stock in connection with the sale of the corporate property.

9. **Corporations ⬳425(6)—Contract to sell stock and assets estops corporation to deny authority to sell stock.**

   A corporation contracting to sell all of its capital stock and property is estopped to defend an action to enforce the contract on the ground that it had no authority to sell the stock in the hands of the stockholders.

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10. Corporations ☞452—Secretary held to have attested corporate act, and not merely witnessed signature of vice president.**

Where a contract was signed in the name of the corporation by its vice president, followed by the words: "Attest: C., Secretary"—C. signed officially as secretary to attest the corporate act, and not merely as witness to the vice president's signature.

**11. Tender ☞15(6)—Not insufficient because in form of certificate of deposit, when refused on other grounds.**

Where the tender of a certificate of deposit was not refused because made by certificate of deposit, but because the contract under which the tender was made was made by persons without authority, any other or further tender was unnecessary.

**12. Corporations ☞432(1)—Presumption of general authority arises from recognition of particular contract.**

Where one of the three officers and stockholders of a corporation recognized a contract signed by the others for the sale of all the stock and property of the corporation, the presumption of general authority to make such a contract arises, in the absence of evidence to the contrary.

**13. Corporations ☞410—A stockholder and officer, having general authority from others to make contract, did not require specific authority.**

Where one of the three stockholders and officers of a corporation had general authority from one of the others to sell all the corporate stock and assets, specific authority to contract was not required.

**14. Evidence ☞75—When letter not produced, oral evidence of its contents accepted as correct.**

Where defendants failed to produce a letter written by one of them to another, and shown by oral evidence to have authorized the making of the contract involved, the oral evidence as to its contents will be accepted as correct.

**15. Corporations ☞432(12)—Evidence held to show written authority of a stockholder and officer to act for others in selling corporation's property and stock.**

Evidence held to show that one of the three stockholders and officers of a corporation had written authority from another to make a sale of the corporation's property and stock at the best price obtainable.

Appeal from the District Court of the United States for the Eastern District of Kentucky at London; Andrew M. J. Cochran, Judge.

Suit in equity by Walton Sudduth against the Storm King Coal Company and others. From a decree dismissing the bill, plaintiff appeals. Reversed and remanded, with directions.

A. F. Kingdon and D. E. French, both of Bluefield, W. Va., for appellant.

James H. Jeffries, of Pineville, Ky. (James H. Jeffries, of Pineville, Ky., and W. F. Hall, of Harlan, Ky., on the brief), for appellees.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DONAHUE, Circuit Judge. This is an appeal from a decree of the United States District Court for the Eastern District of Kentucky in an equity·cause in which Walton Sudduth was the plaintiff and the Storm King Coal Company, J. W. Nolan, L. E. Yoder, A. M. Clark, and the First National Bank of Hazard were the defendants. It appears from the evidence that the Storm King Coal Company is a corporation, that J. W. Nolan is its president, L. E. Yoder its vice president and general manager, and A. M. Clark its secretary; that these

three individuals own, or on the 23d day of April, 1918, did own, all of the capital stock of that company that had been issued to that date, amounting in the aggregate to $38,500. On the date above named a contract in writing was executed by the parties whose names are signed thereto, which contract reads in the words and figures following:

"This contract, made and entered into by and between Storm King Coal Company, a Kentucky corporation, of the first part, and Walton Sudduth, of the second part, witnesseth: "Whereas, first party is incorporated with a capital stock of fifty thousand dollars; and whereas, said company is now the owner of a certain lease of coal land in Perry county, Kentucky, and has made certain improvements on said lease; and whereas, said company is indebted in the sum of approximately eighteen thousand dollars:

"Now, in consideration of one hundred dollars, cash in hand paid to first party by second party, the receipt of which is hereby acknowledged, and other consideration as hereinafter stipulated, first party hereby agrees to sell, transfer, and assign, and cause to be sold, transferred, and assigned, all of the shares of the capital stock of said corporation, viz. fifty thousand dollars, and to deliver possession of said lease and improvements of the said Storm King Coal Company free from all liens and incumbrances on May 1, 1918, and from all claims of damages due to any act of first party prior to May 1. 1918. Second party agrees to pay therefor the sum of forty-five thousand dollars—eight thousand nine hundred dollars in cash, on taking possession of said lease, mine improvements, and said stock properly transferred; nine thousand within six months; and nine thousand within twelve months thereafter. It is agreed that second party also assumes the indebtedness of first party to the extent of eighteen thousand dollars, which sum is to be paid to the debtors of first party as same become due. Second party shall execute his notes to first party for the deferred payment herein, with 6 per cent. interest from date thereof. It is understood by the parties hereto that there is an option outstanding on said property, which expires May 10, 1918, and it is agreed that said option be assigned to the second party by first party, and in event the same is exercised by the grantees therein within said time second party shall be entitled to the benefit accruing by reason of same.

"Witness our hands April 23, 1918.

"Storm King Coal Company,
"By L. E. Yoder, Vice President & G. M.
"Attest: A. M. Clark, Secretary.
"Walton Sudduth.
"Witness: T. L. Hudgins."

At the time this contract was executed, Sudduth gave his check payable to the Storm King Coal Company for $100. This check was deposited in the Perry County State Bank at Hazard, Ky., to the credit of the payee, and was in the due course of business paid by the Commercial Bank of Bluefield, W. Va., upon which it was drawn. On the 1st day of May, 1918, the persons holding the option mentioned in the foregoing contract elected to take the property at the price named therein, to wit, $75,000; but it appears that the coal company had agreed to pay $10,000 for negotiating this sale. It further appears that Sudduth was orally advised of that fact at the time the contract was signed, and agreed to that arrangement.

On the 1st day of May, Sudduth came to Hazard prepared to make the cash payment and take over this property. On account of missing his train connection at Shelby Junction, he did not reach Hazard until about 6:30 or 7 o'clock on the evening of that day; but he sent a telegram from Ashland to the Storm King Coal Company, advising that he had missed connections at Shelby, but would arrive at Hazard

that evening. When he reached Hazard, he discovered that the individuals who had elected to take under the prior option were already there to arrange for the transfer of the property to them. He was then informed that Nolan, the president, repudiated the contract made by Yoder and Clark, and that Yoder and perhaps ·Clark, also, were disposed to treat it as invalid, because they had no authority from Nolan to make such a contract.

All parties, however, were willing to have the sale consummated to the first option holder, and in order to facilitate this deal and permit it to go through without friction, a trust agreement was entered into between Sudduth, on the one part, and Nolan, Yoder, and Clark, on the other, that $20,000 of this purchase price, in United States government Second Liberty Loan bonds, should be deposited in the First National Bank of Hazard, Ky., to be held by that bank in trust for the benefit of whichever of these respective claimants might later be adjudged the owner by decree of any court of competent jurisdiction. The First National Bank of Hazard, Ky., has no other or further interest in this controversy, but merely holds these bonds subject to the order of the court.

Sudduth then brought this action in equity in the District Court of the United States for the Eastern District of Kentucky, making the Storm King Coal Company, Nolan, Yoder, Clark, and the First National Bank of Hazard, Ky., defendants, and praying for a decree against the Storm King Coal Company for the sum of $20,000, with interest from the 1st day of May, 1918, and costs of suit, for a decree against the First National Bank of Hazard, Ky., directing that bank to deliver to him the bonds held by it under the trust agreement, and for such other and further equitable relief as the court might find to be just and proper. His cause of action is based upon the contract of April 23, 1918.

The defendants, other than the First National Bank of Hazard, filed an answer, denying that Sudduth had performed or attempted performance of his part of the contract, and alleging that the contract never was valid, binding, or enforceable, because it is unilateral in its nature, and does not contain any stipulation on the part of Sudduth to perform any act whatever; that by mutual mistake of the parties thereto at the time, and of the draftsman who prepared the same, the price named therein is $45,000, when it should have been $63,000; that the contract is not signed by either of the individual defendants, Nolan, Yoder, or Clark, and is therefore not a valid or binding contract against either of them; that the Storm King Coal Company was not then or at any other time authorized to sell or transfer the stock held by these defendants; that the plaintiff was intending and attempting to purchase nothing else than all the shares of capital stock and the assets of said defendant coal company, and neither the coal company, Yoder, or Clark were authorized or empowered to sell or transfer any share of the capital stock in said corporation then held and owned by the defendant J. W. Nolan, who at that time owned in his own right one-third of the issued and outstanding shares of the capital stock of this company; that the Storm King Coal Company was the owner of

135 shares of unissued treasury stock, and that Yoder, vice president, and Clark, secretary, were not then or at any time, either jointly or severally, authorized or empowered to sell, transfer, or convey any of said 135 shares of treasury stock so belonging to said corporate defendant.

Upon the issue so joined, the District Court found that by mutual mistake of the parties the written contract did not embody the oral contract, and allowed recovery in favor of Sudduth for the $100, without interest, paid by him upon this contract, and ordered and directed the First National Bank of Hazard, immediately after the expiration of 30 days from the date of the decree, to deliver the bonds deposited with it to the defendants Nolan, Yoder, and Clark, and dismissed the plaintiff's bill.

[1] The first question presented by this appeal is the validity of the contract sued upon. It is clearly not a unilateral contract. Sudduth paid $100 cash upon the purchase price named therein; he agreed to pay $8,900 in cash on taking over lease and mine improvements and stock properly transferred. This, with the $100, would make $9,000. He also agreed to pay the further sum of $9,000 in 6 months, and $9,000 in 12 months, and to pay in addition to these sums the indebtedness of the coal company to the extent of $18,000 as the same became due. This aggregates the full sum of $45,000 which he agreed in this contract to pay for this property. It is therefore apparent that this was not even an option contract, but rather a contract for the purchase of the property, that, if not invalid for other reasons, would be clearly enforceable, not only against the Storm King Coal Company and these stockholders, but also against Sudduth himself.

[2] Coming, now, to the consideration of the evidence in reference to the mutual mistake of parties, we are compelled to the conclusion that this evidence wholly fails to establish such a mistake. It is clear that Sudduth was not mistaken about it. He testifies that he caused this contract to be prepared by an attorney in conformity with his understanding of the terms of the oral contract. He still insists that it fully expresses the contract agreed upon between the parties prior to the signing of this written paper. There is not a single syllable of evidence in this record that he was mistaken about it. Either this written contract expresses his understanding of the terms of the oral contract, or he purposely and willfully caused this contract to be written in the manner and form in which it was executed by the parties thereto, for the purpose of fraudulently securing this property at a price less than he had agreed to pay for it. The answer of these defendants, however, does not charge him with fraud, nor do they ask a rescission of this contract for that reason; so that, even if either of these defendants were mistaken as to the terms of this contract when it was signed, the mistake was not a mutual one, and they are entitled to no relief for that reason.

[3] Aside from this consideration, it does not clearly appear from the testimony of Clark that he was mistaken about it. On the contrary, it would seem that he fully understood all of it, especially as to price. He does not deny the testimony of Sudduth that he told Sud-

duth the others "want to kick out of the contract." He then offered to transfer all of his stock to Sudduth at the price named in the contract, without making any claim whatever as to mistake in it. Yoder's testimony is, at best, unsatisfactory. He says he read this paper, and assumed that "we were getting $45,000 for the stock." The evidence shows that he is a man of large business experience, and perfectly capable of taking care of himself in a transaction of this kind. The language of the contract is plain, explicit, unambiguous, and of easy understanding. He testified that, after Sudduth had presented this contract, he and Clark went into the back room for a little conference, and when they came out of that room Clark signed the contract and it was delivered to Sudduth.

This contract, or a copy of it, remained in the possession of Yoder from its date until May 1st, and yet no objection was made by him, nor was notice given to Sudduth that it did not fairly state the agreement of the parties. Yoder testifies that "up here on the ground after a few days" he did make such a statement to Sudduth. Later he testified that it was Sudduth's counsel he notified the first day he came to Hazard, but he does not inform the court when he discovered that mistake. Certainly it was not between the time that Sudduth reached Hazard and the time of the signing of the trust agreement. Mr. Wooton, a member of the bar of Hazard, Ky., was present at these early conferences, and particularly the conferences about May 3d between Sudduth and his counsel and these defendants, and he heard no statement from any one in reference to a mistake in the contract. Mr. Clark does not testify that he had at any time called Sudduth's attention to any mistake in this contract, or that he heard Yoder do so, until some time after the trust agreement was made. Mr. Nolan, when he told Sudduth that Yoder and Clark had no authority to act for him, and that the Storm King Coal Company had no authority to transfer this lease without the consent of the owner of the fee, did not mention anything about mistake. Evidently up to that time Yoder had not communicated that information to him.

[4] Contracts are reduced to writing, not only for the purpose of evidencing the terms and conditions agreed upon, but for the further purpose of preventing misunderstanding and mistake. It is the duty of every person, competent to contract, to use due care and diligence to ascertain, before signing a written contract, that it fully and fairly expresses the agreement he has made or intends to make. Courts cannot act as guardian for either of the contracting parties, nor can they treat a written contract as "mere scraps of paper." On the contrary, it is the duty of a court to enforce all the terms of a contract as written, unless it shall appear by the evidence, either that there was a mutual mistake of all persons party thereto, or that the signature of one or more of these parties was obtained through undue influence, fraud, or fraudulent representation. If Yoder signed this contract under the mistaken belief that it provided for a consideration of $63,000, instead of $45,000, that mistake was due to his own fault and negligence; for it is not claimed that he was deprived of a full and fair opportunity to examine it in detail as to all of its terms. A court

cannot grant him relief merely because he was negligent, and it is equally powerless to grant relief if he was in fact mistaken as to its terms, unless that mistake was a mutual mistake of all the parties.

[5] The claim is made in brief of counsel for appellees, and is also discussed at considerable length in the opinion of the trial court, that Sudduth was buying only the stock of this corporation that had been issued to Nolan, Yoder, and Clark. It is clear that this was not the intent or purpose of either party to this contract. Paragraph 5 of appellees' answer expressly avers that Sudduth—

"was intending to and attempting to purchase nothing else than all of the shares of the capital stock and assets of said defendant the Storm King Coal Company."

This is not only the claim of the appellant, but would seem to be a correct interpretation of this contract, which in terms provides for the transfer and assignment of the capital stock and—

"the delivery of the possession of the lease and improvements of the Storm King Coal Company, free from all liens and incumbrances."

For this reason we cannot agree with the construction reached by the trial court that the subject-matter of this contract was solely and only the capital stock of the corporation. It is, of course, true that a corporation cannot sell the stock it has issued to its stockholders; but it must be remembered that this was a close corporation, owned entirely by these three men, all of whom testified that there were very few directors' meetings, and that the management of the corporate business was all informal. It was no more than a legal entity through the agency of which this property was acquired and these business activities conducted.

[6] A court of equity is not concerned with the outward forms, but, on the contrary, will disregard form, and look to the substance of every transaction. Chicago Co. v. Minn. Civic Association, 247 U. S. 490–501, 38 Sup. Ct. 553, 62 L. Ed. 1229; Iron Co. v. Arctic Co., 261 Fed. 15–17, 171 C. C. A. 611; Kalamazoo Spring & Axle Co. v. Winans, Pratt & Co., 106 Mich. 193–198, 64 N. W. 23; Eureka Iron & Steel Co. v. Bresnahan et al., 60 Mich. 332–337, 27 N. W. 524; Conely v. Collins, 119 Mich. 519, 78 N. W. 555, 44 L. R. A. 844; Harrison & Co. v. Blacker, 15 Ohio N. P. (N. S.) 377.

The transfer of the stock was merely incident to the sale and transfer of all the property of the corporation. If a corporation disposes of its entire assets, its stock in the hand of its stockholders is worthless, and might just as well be transferred to the purchaser of its property. It is the usual and ordinary method by which the transfer of, not only all the corporate property, but the control of the corporation itself, is accomplished.

In this particular case the final contract with F. E. Hadley provided, just as in the Sudduth contract, not only to deliver possession of the lease and all improvements, but also for the transfer and assignment of all of the capital stock of the Storm King Coal Company. This fully appears from the following provision found in the last paragraph but two of the Hadley contract that—

"This contract, and the said sale and transfer of said property, stock, lease, and equipment, fully consummated, shall not be exceeding fifteen days from date hereof."

And it is further provided in the last paragraph but one of this contract that—

"It is understood that the Storm King Coal Company executed to H. H. Cupler an option to purchase the said property and stock of the said Storm King Coal Company on April 10, 1918, and that said option expires May 10, 1918."

It therefore not only appears from these several contracts, and particularly from the construction given the Cupler contract by these defendants themselves, as that construction is expressed in the last paragraph but one of the Hadley contract, that they not only contemplated in all of these contracts the sale of all the property and assets of the corporation, as well as the transfer of stock to the purchaser, but that they in fact did accomplish the transfer and sale to Hadley of all corporate property and all stock of the corporation in this identical manner.

[7, 8] The owners of the capital stock are the sole and only beneficiaries of the purchase price to be paid the corporation for its entire property. The payment of this purchase price by Sudduth to the corporation itself was sufficient consideration for the contract and agreement on their part to transfer their stock to the purchaser of the corporate property. To permit the stockholders who signed this contract to deny that they consented and agreed to the transfer of their stock in connection with the sale of the corporate property would be to put a premium on fraud. If they in fact had authority from Nolan to make and enter into this contract, he is equally bound by its terms.

If this contract contemplated merely a transfer of stock in the corporation, then provision as to payment of debts would have been wholly unnecessary, for the corporate property would still remain subject to the payment of these debts. That these provisions are made in this contract to pay all the outstanding debts of the corporation is some evidence, at least, that the purpose and intent of the contracting parties was that all of the property of the corporation should be transferred to Sudduth. The fact that this contract was made in the name of the Storm King Coal Company is almost conclusive proof that the main object and purpose of that contract was the purchase and sale of the corporate property of that corporation. It is hardly conceivable that men experienced in business affairs, intending either to buy or sell only the shares of the capital stock held by the separate stockholders, should attempt to accomplish that purpose by a contract in the name of the corporation itself. Certainly the lawyer who wrote the contract would not be guilty of such a monumental folly.

[9] This corporation that has entered into this contract with Sudduth is now defending jointly with these stockholders, upon the theory that it had no authority whatever to sell the shares of its capital stock in the hands of its stockholders. It would seem unnecessary to say that the corporation is estopped from making any such defense. The fact that it agreed to transfer this stock carried with it the assurance

to the other contracting parties that it had such authority. However, it did have the authority "to deliver possession of said lease and improvements of the said Storm King Coal Company free from all liens and incumbrances on May 1, 1918." This undoubtedly was the main object and purpose of the contract, and yet it did not offer to perform this important part of the contract that it had full power and authority to perform. If it had done this, it would have at least shown good faith on its part to the extent of its power and ability to perform. Undoubtedly this would have amounted to a substantial performance, for in view of the fact that the corporation had no other or further property, and that the outstanding stock was therefore valueless, Sudduth could have recovered no more than nominal damages for failure to perform the full contract according to its terms.

[10] It is claimed, however, that Clark did not sign this contract, except as a witness to the signature of Yoder. The word "Attest," before the signature of Clark as secretary, does not mean that he is merely signing it as a witness, but, on the contrary, that he is signing it officially as secretary of the company. This is the usual formula employed in the execution of all deeds and contracts by the president and secretary of a corporation, and where witnesses are required, as in the execution of a deed or other paper of like character, other persons must be called in to act in that capacity. If Clark did not understand that he was signing this as secretary of the company, he should have signed his name as witness, after the signature of Sudduth, and along with the other witness, T. L. Hudgins. In that case the word "Secretary," after his name, would be wholly unnecessary and superfluous. On the contrary he did sign his name in the proper place as secretary, attesting, not the signature of Yoder, but the corporate act.

[11] It is also claimed on the part of the appellees that Sudduth did not perform or tender performance on his part. The evidence establishes the fact that he went to Hazard on the evening of May 1st, having wired to the appellees that he had missed connections at a way station and could not reach there earlier in the day. One of them met him at the train. Later he talked with all of them in reference to the completion of this contract. He had in his possession a certificate of deposit for $10,000. The banks were closed, and he could not obtain the money in currency, and tender the exact amount of the first payment; but he did tender to at least two of them the entire certificate of deposit for $10,000. To this form of tender they made no objection whatever, but then and there informed him that this contract would not be carried out, and the only reason given, either by Clark or Nolan, was that Clark and Yoder had no authority from Nolan to make this contract. Yoder claims he did tell Sudduth's counsel that there was a mistake in the contract as to the purchase price; but the preponderance of the evidence would seem to be the other way. Regardless of how that may be, they all flatly refused to carry out this contract, except Clark, who offered to transfer his stock to him. Yoder also testified that he offered to transfer his stock to Sudduth; but his testimony is not clear and definite as to whether it was at the price of

$45,000 or $63,000. While equity will follow the law, the law does not require any one to do a useless thing. If these appellees had refused to carry out this contract, because the tender was made by certificate of deposit, instead of cash, then it would have been the duty of Sudduth to procure the cash and make the tender in that way; but the basis of their refusal was for other reasons, and therefore Sudduth was not required to make any other or further tender of the cash payment at that time.

[12, 13] The most serious question in this case is the question of the authority of Yoder and Clark to represent Nolan in this transaction. Nolan testifies they had no authority from him to make this particular contract; but he absolutely fails to testify that Yoder had no general authority from him to make a sale of the corporate property, including the transfer of the stock held by each of them. In view of the fact that he recognized the Cupler contract, signed only by Yoder and Clark, the presumption obtains, in the absence of evidence to the contrary, that Yoder had such general authority, and in that event specific authority to make this particular contract would not be required.

Yoder and Clark made many option contracts for the sale of this property. They made the option contract with Cupler, under which Hadley & Co. finally purchased this property. Yoder insisted he had authority from Dr. Nolan to sell this property. Cupler demanded to be shown this authority, and Yoder produced a letter from Dr. Nolan authorizing Yoder to act for Nolan. There was no price fixed in this letter. Both Nolan and Cupler testified that Nolan signed this option contract; but later Cupler was recalled to the stand, and the original contract was exhibited to him, which he identified as the original by the fact that he had glued a corner down as he was going to New York, because it kept coming apart, and from the paper itself it appeared that it was not signed by Dr. Nolan, but only by Yoder, vice president, and A. M. Clark, secretary. Later, however, when Cupler transferred this contract to Hadley, Dr. Nolan signed his name as a witness to the signature of Cupler to the transfer. This no doubt explains the former testimony of Cupler, and the testimony of Nolan, that Nolan had signed the original contract.

[14] Yoder evidently thought he had authority to sell for $63,000 at least, and no doubt based his assumption of authority upon this letter; but the letter, according to the evidence of Mr. Cupler, did not stipulate any particular price, so that, if that letter was his authority to sell for $63,000, it was also his authority to sell for $45,000. There is no dispute in the evidence in reference to this letter, or its contents, as testified to by Mr. Cupler. So far as disclosed by the evidence, that letter is still in possession of Yoder. It was important that it should have been produced on the trial and offered in evidence. The failure of defendants to do this, without explanation, necessarily leads to the conclusion that the evidence of Cupler as to its contents is correct.

[15] For this reason, this court has reached the conclusion that Yoder had written authority from Nolan to make the sale of this property at the best price obtainable and satisfactory to Yoder and Clark, and in making such sale to enter into such contract with refer-

ence to the transfer of stock and property of the corporation as might be deemed necessary or proper by Yoder.

The judgment of the District Court is reversed, and cause remanded, with directions to the court to enter judgment for the appellant, and directing the First National Bank of Hazard, Ky., to turn over and deliver to Sudduth the bonds held by it under the trust contract, and also judgment for $100 against the defendants for the advance payment made by Sudduth upon the purchase price of this property, together with costs of suit.