## PALMOLIVE CO. v. CONWAY et al.
### No. 1406.

District Court, W. D. Wisconsin.
Aug. 6, 1930.

See, also, 37 F.(2d) 114.

Lines, Spooner & Quarles, of Milwaukee, Wis., Olin & Butler, of Madison, Wis., and Nathan Glicksman, of Milwaukee, Wis., for plaintiff.

John W. Reynolds, Atty. Gen., Theo. W. Brazeau, Sp. Counsel, of Wisconsin Rapids,

Wis., and Leo J. Federer, Attorney for Wisconsin Tax Commission, of Madison, Wis., for defendants.

LINDLEY, District Judge.

Plaintiff seeks to enjoin the state tax commission and the county treasurer from collecting additional state income taxes assessed for the years 1924, 1925, and 1926, on the ground that the assessments are illegal under the Wisconsin law and that the collection thereof would violate the rights of plaintiff under the due process clause of the Federal Constitution.

Palmolive Company of Wisconsin, hereinafter referred to as the Wisconsin company, under that and other names, had existed in Milwaukee since 1894, manufacturing and selling trade-marked "Palm Olive" soap. In 1923 the individuals connected with it as officers and otherwise organized as a Delaware corporation the Eastern Operating Company, which during the same year became the Palmolive Company (of Delaware), and later the Palmolive-Peet-Colgate Company, its present name. This corporation is hereinafter designated the parent company. During the same year the same interests caused to be incorporated, also in Delaware, the Western Operating Company, which retained its original name during all the taxable period under consideration, but later, in 1927, became Palmolive Company (of Delaware), and through ownership of all the outstanding capital stock of the Wisconsin company, as a result of the latter's dissolution, succeeded to all the assets thereof. The assets it thus received were subject to outstanding liabilities, including the alleged unpaid additional income taxes. Hence it became plaintiff herein, seeking to restrain the taxes, and is hereafter designated plaintiff company.

Upon incorporation of the parent company it acquired all the capital stock of the Wisconsin company. It then purchased from the Wisconsin company all the assets of said corporation located outside of the state, consisting of real estate, warehouses, branch offices, merchandise, and the accounts receivable due from parties outside of the state and the intangibles, consisting of trademarks, trade secrets, and good will, paying therefor by delivering to the Wisconsin company a certain proportion of the latter's capital stock, which then became treasury stock of the Wisconsin company. The remainder of the capital stock the parent company then sold to plaintiff company in exchange for all the capital stock of plaintiff and certain advances. Plaintiff company then bought from Wisconsin company the manufacturing plant and equipment located at Milwaukee, and paid for same by delivering to Wisconsin company a certain part of the capital stock of the latter which it had received from the parent company. This stock became treasury stock of the Wisconsin company. The capital stock of the Wisconsin company remaining in the hands of plaintiff company then, and thenceforth constituted the only capital stock of Wisconsin company outstanding.

As a result of this reorganization, parent company became the owner of the property transferred to it by Wisconsin company, constituting all tangible property outside Wisconsin and the intangibles aforesaid and of all the capital stock of plaintiff. Plaintiff became the owner of the Milwaukee plant and equipment and of all the capital stock of Wisconsin company. The latter remained the owner of the inventory at Milwaukee and the accounts receivable relating to Wisconsin business. The properties of the three companies remained in this status throughout the taxable period.

The three corporations were governed by officers and directors substantially identical. The parent company established its chief office in Chicago, where it occupied seven floors. Plaintiff had no separate offices and no full time employees. Its transactions were few, and its books and records were kept by the office force of parent company.

Plaintiff leased the manufacturing plant and equipment occupied by Wisconsin company at Milwaukee, and conveyed by the latter to plaintiff as aforesaid to the Wisconsin company for a fixed rental in 1924 of $120,000, plus taxes and repairs and in 1925 and 1926 for 5½ per cent. of the investment therein plus depreciation. The rental for 1925 was $234,394, and for 1926 $231,108.

Parent company contracted with Wisconsin company to buy the latter's entire output of Palm Olive soap, except such as Wisconsin company might sell in Wisconsin, for the year 1924, at factory cost plus 3 per cent. For 1925 and 1926 the purchase price was factory cost plus 6 per cent.; the change being made, as now insisted by plaintiff, because in 1924 glycerine, a by-product of considerable importance as a saleable product, was not credited against factory cost, whereas, in 1925 and 1926, it was, though the contract for none of the years mentions glycerine. Plaintiff asserts that the failure to consider the proceeds of sale of glycerine in determining

factory costs in 1924 was due to an oversight, and that it was a matter involving too much labor thereafter to correct the same, though the glycerine sales in 1924 amounted to $493,000 and increased through following years to over $900,000 in 1926. The parent company purchased all material for the Wisconsin company and reserved the contractual right to supervise the Wisconsin company's manufacturing activities.

As a result of the reorganization above narrated, there were created an open account from Wisconsin company to parent company of $1,597,390 and one from plaintiff to parent company of $4,058,569. Upon these accounts no interest was charged in 1924, but in 1925 and 1926 the parent company charged 5½ per cent.

The Wisconsin company calculated income upon the basis of its profits upon its factory cost plus percentage contracts aforementioned and its profits from Wisconsin sales and in 1924 reported an income of $298,000, in 1925 $273,000, and in 1926 $341,000. Plaintiff reported on the basis of its rental receipts from Wisconsin company less interest paid to parent company, and reported net income in 1924 of $17,950, in 1925 a deficit of $90,911, and in 1926 a deficit of $101,352. The tax commission allocated certain of the profits of the parent company and of the Buckingham Agency to these two companies, fixing the taxable income of both of them for 1924 at $1,297,967, or an increase of $1,175,108, and for 1926 at $1,367,879, or an increase of $1,127,446. It is the assessments upon this alleged additional income that plaintiff now seeks to enjoin.

The defendants justified their actions under section 71.01 of the Wisconsin Statute 1925, which provides, "There shall be assessed, levied, collected and paid a tax on all income received in each calendar year beginning with the year 1920, by every person residing within the state, and by every nonresident of the state, upon such income as is derived from property located or business transacted within the state, except as hereinafter exempted;" under section 71.02, which provides, "Income from mercantile or manufacturing business, rentals, royalties or the operation of any farm, mine or quarry or from the sale of real or personal property for the purposes of taxation, shall follow the situs of the property or business from which derived;" and under section 71.25, which provides, "When any corporation liable to taxation under the act conducts its business in such manner as either directly or indirectly to benefit the members or stockholders thereof or any person interested in such business, by selling its products or the goods or commodities in which it deals at less than the fair price which might be obtained therefor, or where a corporation, a substantial portion of whose capital stock is owned either directly or indirectly by another corporation, acquires and disposes of the products of the corporation so owning a substantial portion of its stock in such manner as to create a loss or improper net income, the commission may determine the amount of taxable income of such corporation for the calendar or fiscal year, having due regard for the reasonable profits which but for such arrangement or understanding might or could have been obtained from dealing in such products, goods or commodities."

The Commission contends that it ignored no constitutional rights of plaintiff, but recognized all of such rights and rendered its decisions in accordance therewith. The question as presented is whether, with the same business in Wisconsin as before, the corporation has by its contracts so manipulated its organization and contracts and relations to cover up the true income attributable to Wisconsin property and business; whether the court may go behind the contracts of the correlated corporations, or whether it is bound by the same. If the contracts are binding upon the state, if no part of the alleged additional income is attributable to the state of Wisconsin, no relief can be had, but, if the circumstances are such that it follows that the contracts were made for the express purpose of evading taxation, that is, to attempt to remove, without in fact removing, income earned in the state of Wisconsin to a place beyond the state, then the court has a right to go behind the contract and ascertain the facts.

The Wisconsin company shipped direct to parent company's customers outside Wisconsin just as it did to its own customers in the state, and losses from miscarriage of shipments were treated as an expense of Wisconsin company. The parent company advertised for Wisconsin company, and reserved in its contract the right to control the amount of product which Wisconsin company might sell to its trade. The federal income tax return of Wisconsin company was consolidated with that of parent company and plaintiff company, but no part of the federal income tax was charged to the Wisconsin company or to plaintiff. One of the witnesses for plaintiff in his testimony stated that the "branch accounting mark at Milwaukee" ne-

cessitated the employment of three people. New additions to the machinery and equipment at Milwaukee were purchased by Wisconsin company and charged to plaintiff. Plaintiff evidently had no office and no activities other than to lease the plant to Wisconsin company and pay interest to the parent company. Though plaintiff claims that an item of approximately $500,000, representing proceeds of sale of glycerine, was incorrectly treated, it explains the failure of either plaintiff or Wisconsin company to attempt to correct the same, by saying that the resulting difference in factory cost was so insubstantial as not to warrant the expense of the labor to correct the same. Though the account of over $4,500,000 appeared due from plaintiff to parent company, no charge of interest thereon was made during 1924. After that year, though no change in contract to such effect was made, interest at 5½ per cent. per annum was charged, and was of such amount as to wipe out plaintiff's income from rental and create a deficiency. Interest was charged to Wisconsin corporation on an open account in favor of parent company in 1925 and 1926, but not in 1924, though the account existed in that year also. The only fair conclusion is that these inconsistencies in the glycerine and interest accounts were ignored, for the reason that in the end all profits directly or indirectly, through the control of plaintiff and Wisconsin company passed to the stockholders of parent company, and bookkeeping charges between the various corporations were therefore not of essential or substantial importance.

Though Wisconsin company attempted to transfer its good will to parent company, it necessarily reserved such parts thereof as were involved in the manufacture of Palm Olive soap under the trade-mark name, according to the trade formulæ developed in the past, and in the direct sale of the trade-marked article to the trade in Wisconsin. The Wisconsin company, for the period of 1924, 1925, and 1926, received an average price per gross for the product sold parent company of $3.52 and for the product sold in the trade in Wisconsin of $9.24, while the parent company received from the trade for its soap manufactured by Wisconsin company an average price of $9.14. This resulted in an average gross profit to Wisconsin Company of 17 cents per gross on the goods sold parent company and of $5.78 on the goods sold direct to Wisconsin trade, while the parent company in the same years realized upon the soap manufactured by Wisconsin company for it $5.61 per gross. Through its operations during the period of 1921, 1922, and 1923 the Wisconsin company sold on an average per year $19,519,531, with an average gross profit of $10,305,573, or over 50 per cent. of the sales. For the years 1924, 1925, and 1926, the Wisconsin company, with a product of some slightly greater cost, had total average sales, including Wisconsin sales, of $11,711,975, and an average gross profit therefrom of $936,483, or only about 9 per cent. of the sales. The gross profit in the three latter years was less than 10 per cent. of the gross profits for the three preceding years, though the volume of articles sold was greater. Obviously this reduction of over 90 per cent. in gross profit and of almost 50 per cent. in total sales was due entirely to the fact that under its contract, in the latter years, it sold substantially all its product for factory cost plus 3 per cent. or 6 per cent. to the parent company, which then disposed of same to the trade at an average gross profit of about 50 per cent., which in the former years had been realized by Wisconsin company.

These and many others facts of like import and significance lead the court to conclude that under the undisputed circumstances shown, and the intercorporate relations shown, the contract of factory cost plus percentage manufacture and sale to the parent company constituted a fraud upon the income tax laws of Wisconsin. Though a corporation, like a natural person, may freely change its residence at will for no other purpose than to escape taxation in Wisconsin (Will of Heymann, 190 Wis. 97, 104, 208 N. W. 913; In re Village of Chenequa, 197 Wis. 163, 169, 221 N. W. 856), though corporations may be interrelated by means of common directors or common ownership of stock and yet make valid contracts (Smith v. Chase & Baker Piano Mfg. Co. [D. C.] 197 F. 466), and though tax commissions are ordinarily not concerned with the question as to the wisdom of such contracts, and may not generally obtrude their judgment as to the wisdom of such contracts upon such corporations (Yoakam v. Providence Biltmore Hotel Co. (D. C.) 34 F.(2d) 533, 538; Southwestern Bell Tel. Co. v. Public Service Comm., 262 U. S. 276, 289, 43 S. Ct. 544, 67 L. Ed. 981, 31 A. L. R. 807; United Fuel Gas Co. v. R. R. Comm. of Ky., 278 U. S. 300, 49 S. Ct. 150, 73 L. Ed. 390), yet commissions as well as courts may legitimately look beyond the corporate entities and determine the facts as they are. In the language of the Supreme Court, "while the statements of the law thus relied upon are satisfactory in the connection in which they were used, they have been

plainly and repeatedly held not applicable where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies." Chicago, Milwaukee & St. Paul Railway Co. et. al. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 38 S. Ct. 553, 557, 62 L. Ed. 1229. In such cases "the courts will not permit themselves to be blinded or deceived by mere forms of law but, regardless of fictions, will deal with a substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require." Chicago, M. & St. P. Ry. Co. et al. v. Minneapolis Civic & Commerce Ass'n, 247 U. S. 490, 38 S. Ct. 553, 557, 62 L. Ed. 1229. They may freely go behind apparent distinct legal entities and ascertain whether the circumstances prove a device to evade taxation and place an obstacle in the way of collection of a tax due under the law.

Considering these propositions of law in the light of the evidence, the only logical conclusion is that the reorganization of the Wisconsin company and the relations between the corporations named took their rather cumbersome and involved nature for the purpose of evading the Wisconsin tax, and for the purpose of giving the appearance of removing from the state all income of the Wisconsin company over 6 per cent. plus factory cost, whereas in fact there was left within the state such activities as produced within the state much more income than the ostensible sum created by the contracts. To all intents and purposes the situation was the same as if the Milwaukee plant and its production were in fact part and parcel of the parent company. The creation and use of three corporations could serve no substantial beneficial purpose except to appear to remove income from the state though still creating it within the state.

Plaintiff insists that the factory cost, plus percentage contract, was a fair and equitable one; that other manufacturers in America manufacture soap upon a similar basis; that it contracts for the manufacture of soap in foreign countries upon substantially the same basis; that such a contract between two such distinct entities as two corporations must be accepted at its face value; and that to ignore or go behind such contracts is to interfere with the constitutional rights of the parties to contract.

This contention might be of persuasive force, were the facts in the record of such seeming innocent import. But it must be observed in this connection that other soap manufacturers who manufacture soap upon a cost plus basis do so only to the extent of a small part of their capacity. Having manufacturing businesses of their own, producing their own products, but not thereby exhausting their entire productive capacities, they make use of their additional capacities by working on cost plus contracts for others as fillers or as supplementary productions which furnish some profit from sources that otherwise would be entirely idle. There is in the record an eloquent silence as to any manufacturer who has built or bought a factory for the purpose of devoting it entirely to cost plus production. There is an equally eloquent silence as to any manufacturer employing all the productive capacity of his plant to such small profit contracts. This eloquence becomes even more appealing when we recall that the Wisconsin company had previously been producing the same thing at an average gross profit of 50 per cent., and that, after it voluntarily contracted upon the cost basis with its Delaware mother, its profits from the greater production, with equal efficiency, became one-tenth of what they had previously been. The same article was being produced for the same cost, and the actual past gross income therefrom of 50 per cent. of sales was potentially the same as it had previously been. Only by means of the contract was 90 per cent. of such gross profit diverted from the former apparent source in Wisconsin to a new apparent source in Chicago. Yet the only activity diverted to Chicago was the marketing of the goods manufactured in Wisconsin.

It cannot be said that this situation resulted from contractual relations between parties dealing at arms' length. The same directors managed the three companies; the stock of all three beneficially at least belonged to one group, the stockholders of parent company. There were no stockholders to insist that Wisconsin company was being treated unfairly; no one to protect it against the demands of the parent company. Surely the state which created that company and permitted plaintiff to enter Wisconsin and there transact business may, in the enforcement of its sovereign rights, step in and say that it will look into its two children's affairs and for the people of the state ascertain whether Wisconsin company's faithless trustees have, without regard to their fiduciary duties, transferred their company's in-

come to themselves under the cover of another corporate name, and thus deprived the state of its lawful right to insist that such income may pay a tax to the state of its creation.

The tax commission did not allocate to Wisconsin all of the profit upon the goods manufactured in Wisconsin. Whereas in 1921, 1922, and 1923 substantially 90 per cent. of the profits were found to have accrued in Wisconsin, in the years 1924, 1925, and 1926 the apportionment to Wisconsin was only 55.28 per cent. The increased apportionment of 33 per cent. to the territory outside of Chicago was found to be due to the removal of the activities other than manufacture out of the state. In 1921, 1922, and 1923 the average annual Wisconsin income was about $1,800,000, and the income earned out of the state just over $225,000. In the years 1924, 1925, and 1926, according to the commission's allocations, the average annual Wisconsin income was $1,341,274 and the average annual outside income $1,321,053. In other words, the tax commission found that Wisconsin company and plaintiff had through entirely legal means removed from the state annual income of $1,321,000, or six times as much as had previously been earned without the state, and that, though the total profits from manufacture and sale had increased, the total income earned within the state was only about two-thirds what it had been. It reduced earned Wisconsin income to two-thirds of its former amount, and increased the income out of the state six times.

To the assertion of plaintiff that the profits reported by it and Wisconsin corporation amounted to a great percentage upon its investment, the defendants, in the judgment of this court, rightfully reply that plaintiff's and its associate's bookkeeping was misleading in this respect. Without further discussion of this phase, it is sufficient to state that this court finds nothing in the position of the commission in this respect unwarranted or erroneous.

The language of the Supreme Court in Shaffer v. Carter, 252 U. S. 37, 40 S. Ct. 221, 225, 64 L. Ed. 445, is pertinent. There the court said: "And we deem it clear, upon principle as well as authority, that just as a state may impose general income taxes upon its own citizens and residents whose persons are subject to its control, it may, as a necessary consequence, levy a duty of like character, and not more onerous in its effect, upon incomes accruing to nonresidents from their property or business within the

state, or their occupations carried on therein, enforcing payment, so far as it can, by the exercise of a just control over persons and property within its borders." The tax commission of Wisconsin with fairness determined that portion of the income which accrued in the state of Wisconsin, and, as stated in the case last above cited: "The fact that it required the personal skill and management of appellant to bring his income from producing property in Oklahoma to fruition, and that his management was exerted from his place of business in another state, did not deprive Oklahoma of jurisdiction to tax the income which arose within its own borders. The personal element cannot, by any fiction, oust the jurisdiction of the state within which the income actually arises and whose authority over it operates in rem." From the facts it is apparent that the operations of the plaintiff and the Wisconsin company were subject to the jurisdiction of the state of Wisconsin, and there is nothing improper or unconstitutional in the manner in which the tax commission attempted to reach and did reach their proper income. Underwood Typewriter Co. v. Chamberlain, 254 U. S. 113, 41 S. Ct. 45, 65 L. Ed. 165. The plaintiff and the Wisconsin company were not charitable institutions. The Wisconsin company was not in the manufacturing business purely for altruistic purposes, but was created and operated for pecuniary profit, and there appears no reason for the surrender of such profit, which it had demonstrated its ability to earn, other than to evade the taxes thereon and to appear to convey the same to the parent company for distribution amongst the stockholders without contribution under the revenue laws of Wisconsin. As stated by the court in the case of Judson Freight Forwarding Co. v. Commonwealth, 242 Mass. 47, 136 N. E. 375, 380, 27 A. L. R. 1131: "Petitioner is * * * a business corporation organized for profit. It cannot avoid responsibility to local laws for local business by so gauging its charges as to allocate its profit wholly to interstate business. It has adopted this method voluntarily for its own ends. The commonwealth is not bound by these methods. The taxing power has a right to look to the substance of things and collect its imposts from whatever is within the jurisdiction of its constitutional laws." Courts will not permit themselves to be blinded or deceived by mere forms of law, but will deal with the matter as though the corporate agency did not exist. Such is the holding in Wabash Ry. Co. v. American Refrigerator Transit Co. (C. C. A.) 7 F.(2d) 335, and

Judge Geiger in Buick Motor Co. v. City of Milwaukee et al., 43 F.(2d) 385, said: "Manifestly, the state taxing authority was not bound to proceed upon the hypothesis of fact that the income arising on business which the plaintiff transacted had been lawfully abdicated or contracted away in advance; nor that, as against the state, the contract must be effective, precluding the plaintiff from any relationship to the income except the obligation to turn it over as purchase price—in whole or in part—to the Motors Corporation —wherefore the plaintiff *received* no income on its business. Considering the matter in this light, it makes little difference whether the plaintiff and the Motors Company be separate corporate entities, subsidiary or parent, respectively; or whether plaintiff be characterized as a 'dummy'; or whether in any event each be granted legal capability of making a contract of purchase and sale, or even of limitation of profit as between themselves. But the effectiveness of the contract to deny the applicability of the tax law to a part *or to the whole* of the income that arises upon the business which the plaintiff transacts in the state, is quite another matter. * * * It is my judgment what when the business transacted is found to be plaintiff's—conceding the 'subsidiary' relation to General Motors—the tax authorities of the State were not obliged to respect the contract as an instrumentality relieving plaintiff, in whole or in part, from the effectiveness of the tax law against the income arising in or on such business. In other words, the contract cannot be interposed as a means of cutting off the income from the business, or from the plaintiff, and devolving it upon the Motors Company as the one solely responsible to the call of the law."

What has been said has been said with reference to the income of the Wisconsin company and plaintiff company earned in the state of Wisconsin. In the opinion of the court, the situation with regard to the income of the Buckingham Agency is different, and no part of such income should be allocated or charged to the plaintiff or Wisconsin companies. That corporation was organized subsequent to the reorganization hereinbefore discussed. It had only one activity, the placing of advertising. Its activities were all outside of the state; they had no connection with the manufacture, but consisted of placing advertising of the parent company with advertising houses and collecting commissions thereon. No part of its income was directly or indirectly earned in the state of Wisconsin; no part of it is taxable within the state; and, to the extent of the allocation thereof by the tax commission to Wisconsin there should be an injunction as prayed.

Plaintiff's bill for injunction should be denied as to any and all parts of the relief prayed therein except as to such part of the additional assessments as grows out of the allocation of income of the Buckingham Agency to plaintiff and Wisconsin company. To that extent there should be a decree as prayed, and in all other respects plaintiff's bill will be dismissed for want of equity, at the costs of the plaintiff.