### BOYLE v. GRAY et al.*

### SAME v. WEATHERBEE et al.

Circuit Court of Appeals, First Circuit. August 27, 1928.

Nos. 2198, 2199.

*Certiorari denied 49 S. Ct. —, 73 L. Ed. —.

Anderson, Circuit Judge, dissenting.

Joseph B. Jacobs, of Boston, Mass. (Maurice E. Rosen and Frank H. Haskell, both of Portland, Me., on the brief), for appellant.

Frank Fellows, of Bangor, Me. (Ballard F. Keith and J. F. Gould, both of Bangor, Me., on the brief), for appellees.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

BINGHAM, Circuit Judge. These two proceedings are bills in equity, under the provisions of section 70e of the Bankruptcy Act of 1898 and amendments thereto (11 USCA § 110(e), brought by James L. Boyle, trustee in bankruptcy of Frank H. Gordon. The first is brought against Frank H. Gordon, Frank H. Gordon, Inc., and Herbert Gray; and the second against Frank H. Gordon, Frank H. Gordon, Inc., Artemus Weatherbee, and Patrick H. Gillin, the two latter being receivers of Frank H. Gordon, Inc., in a receivership suit brought by Frank H. Gordon, as stockholder and creditor, against the corporation in the Maine court, and also receivers or custodians under a bill in equity brought in the Maine court by Walter V. Wentworth against Frank H. Gordon, Frank H. Gordon, Inc., et al. In both proceedings the trustee seeks to recover certain real estate and personal property used in the construction and operation of certain fox ranches and a large number of foxes, or the proceeds thereof, all of which the trustee claims as the property of Frank H. Gordon, the bankrupt. In the District Court, both

proceedings were dismissed, and the trustee appealed.

In 1922 Frank H. Gordon began the business of selling and ranching silver black foxes, and, in carrying on that business, entered into contracts for the sale and ranching of the foxes sold. Sales were made to a large number of persons during the year 1924, and to a limited extent during 1922 and 1923. By December 31, 1924, he had sold about 1,250 pairs at $2,000 per pair and taken in about $2,500,000. In these sale contracts it was stipulated that Gordon "hereby sells and delivers to the party of the second part one pair of silver black foxes," and further agrees to ranch said foxes "from the date hereof to the date of the birth of the first offspring of said foxes after the first breeding season, * * * and said pair of foxes and said offspring from the date of their birth to the 1st day of January next following * * * without further expense" to the purchaser, and for that purpose was to have "sole possession of said foxes * * * during said season." In the contracts made down to August, 1924, Gordon guaranteed that a pair of foxes sold under a given contract would produce 100 per cent. of offspring for the first breeding season following the date of the contract, and, if less than two were produced by said pair of foxes, to supply young foxes to make up the 100 per cent. production. All offspring produced in excess of 100 per cent. were to belong to Gordon. In the sale contracts made subsequent to August, 1924, the guaranty was reduced to 50 per cent. By the fifth article of the contract the purchaser gave to Gordon an option to purchase the two offspring when produced for $1,500, which option was to continue from the birth of said offspring to January 1st next following. The sale contracts made after August, 1924, also included a provision that the foxes sold should be "segregated and designated by number at some appropriate time during the life of this contract consistent with necessary breeding and ranching arrangements, reserving also the right to substitute other similar foxes for those thus designated, should ranching or breeding necessities demand such substitution."

From and after August, 1924, if not earlier, pens on a designated ranch were numbered, and the pair of foxes in a particular pen so numbered were allotted to a given purchaser or purchasers of a pair of foxes under his or their contracts theretofore issued, and to a purchaser or purchasers of a pair of foxes under sales contracts thereaft-

er issued. This was done in this way: Each ranch where the foxes sold were being ranched contained pens numbered consecutively from 1 to 100. In Gordon's office were kept sheets of paper, each sheet being devoted to and representing a particular ranch, which was divided into squares, representing pens, numbered from 1 to 100. Each sales contract was numbered, and in each square on a sheet, representing a like numbered pen on a described ranch, was inserted the number or numbers of the sales contract or contracts relating to the pair of foxes segregated in that particular pen, and the proportion or fraction of the pair of foxes in that pen assigned or allotted to a particular contract or contracts, thus designating the owner or owners of the pair of foxes in that pen, and whether they had been sold to one or more persons. In all sale contracts made after August, 1924, either by Gordon or his successor, Gordon, Inc., this method of segregating a pair of foxes and allotting them to a particular contract or contracts was followed.

There was also kept in the office of Gordon, and later on in the office of Gordon, Inc., a card index system, in which every contract holder had a card assigned to him containing his name, against which was set the date, the number, and the amount of his contract, the date payment was made on it and how paid, cash or otherwise, and the designation of the particular ranch and pen in which the foxes sold under that contract were.

December 1, 1924, the corporation known as Frank H. Gordon, Inc., was organized under the laws of Maine for the purpose of taking over and conducting the fox business carried on by Frank H. Gordon, and on December 31, 1924, Gordon entered into a contract with Gordon, Inc., whereby he transferred to it his fox business and all the property real and personal used by him in conducting said business, the consideration therefor being all the stock ($300,000) of the corporation and an agreement on its part to assume all the obligations and liabilities of Gordon arising out of his conduct of the business. The property thus transferred included "all the silver black foxes remaining unsold and belonging to me" [Gordon], designating their location, being about 250 foxes ($84,600 was paid for them, at about $350 apiece, or $700 a pair); "all buildings and structures upon leased or rented land," specifying them; "all stock on hand, materials, machinery, pens, tools, lumber," etc., belonging to "Frank H. Gordon and used by

him in his business of silver black fox buying, selling, and ranching," particularly describing the property and designating the ranch or place where the same were situated; some 45 automobiles and 7 trucks, owned and used by Gordon in the fox business; personal property, consisting of a moving picture department; 35 lots of land, situated in Maine and elsewhere; all rights in "the contracts now in force between me and purchasers of foxes from me, having particular reference to my interest and right in and to the option for the purchase of offspring, mentioned and specified in said contract," giving a schedule of the sales contracts; and all accounts due and receivable contracted in the fox business, including general accounts, "accounts receivable from owners," and notes payable.

October 26, 1925, Gordon filed a bill in equity against Gordon, Inc., in the Supreme Court of Maine, asking for a receiver, wherein he alleged that he was a stockholder and creditor of the corporation and that it was solvent. He signed the bill and made oath that the facts therein stated were true. On that day an answer was filed, admitting the allegations of the bill, and thereupon it was decreed that the bill be sustained, that P. H. Gillin and Artemus Weatherbee be appointed temporary receivers of the property of the corporation, with power to carry on its business pending final decree, that a temporary injunction be issued, and that notice be given of a hearing November 17, 1925, for the appointment of permanent receivers. This bill was brought under the provisions of section 23, c. 81, of the Revised Statutes of Maine. The receivers thereupon took possession of all the property of the corporation and of all the foxes in its possession as bailee under its sales contracts, or under sales contracts made by Gordon, for ranching foxes.

November 2, 1925, Walter V. Wentworth, on behalf of himself and all other contract holders numbering about 2,500, brought a bill in equity in the Supreme Court of Maine under chapter 82, § 6, par. 7, Rev. Stats. of Maine, against Gordon, Gordon, Inc., and Gillin and Weatherbee, as receivers of the corporation, setting out the sales contracts; that subsequent to their execution the foxes thus sold were set apart, segregated, and put in designated pens on the ranches, and that the sales contracts were numbered and entered upon the books of the defendants Gordon and Gordon, Inc., as the property of the contract holders; that none of the foxes in the possession of the receivers were the property of Gordon, or of Gordon, Inc., but were the property of the contract holders; that the foxes belonging to the contract holders had been negligently or willfully intermingled and confused by the defendants, so that it was impossible to identify those belonging to a given contract holder; and praying that the court determine and decree the respective rights of the parties to the foxes, order distribution of them to their owners, or make such other disposal as equity and good conscience required; and that P. H. Gillin and Artemus Weatherbee, receivers of Gordon, Inc., be appointed receivers of all the foxes on the ranches of Gordon, Inc., and hold and care for the same "in the interest of the owners thereof until further order of the court."

An answer to this bill having been filed by the defendants Gordon, Gordon, Inc., and others, admitting the facts alleged in the bill, and Gordon having testified in the state court to such facts, and that the title to the foxes sold under the contracts, either by Gordon or Gordon, Inc., were the property of the contract holders, the state court on November 9, 1925, after hearing, entered a decree, in which it found that the foxes sold under the contracts were allocated to the contract holders as alleged; that they remained in the possession of Gordon and Gordon, Inc., as bailee; that without the knowledge and consent of the plaintiffs these foxes, while in the possession of Gordon or Gordon, Inc., as bailee, were confused and their identity lost —and appointed Gillin and Weatherbee custodians of the foxes. Thereafter all known contract holders, except 108, voluntarily became parties to the bill, and the balance of the known contract holders, having been made parties defendant, were duly served with process, and after notice and hearing, the bill was taken pro confesso as to them.

February 13, 1926, Gillin and Weatherbee were appointed temporary receivers in the Wentworth Case, and on April 6, 1926, permanent receivers. August 26, 1926, the receivers in the Wentworth suit sold all the foxes to Herbert Gray for $300,000; and the receivers in the suit of Gordon against Gordon, Inc., sold all the real estate, ranches, and equipment of Gordon, Inc., situated at Lincoln, Maine, to said Gray for $50,000, which sales were confirmed by decrees of the Maine court.

November 19, 1925, an involuntary petition in bankruptcy was filed against Frank H. Gordon, individually, upon which he was adjudged a bankrupt September 21, 1926.

October 15, 1926, James L. Boyle was appointed trustee.

It appears that the bankruptcy petition was not filed until more than four months after the foxes were sold to the various contract holders and had been taken possession of in their behalf by the Maine court through its custodians in the Wentworth suit, and until more than four months after the real estate and personal property were sold to Gordon, Inc., and had been taken possession of by the Maine court through its receivers in the suit against Gordon, Inc., although the state court proceedings and the possession taken under them were had within four months of the filing of the petition in bankruptcy.

October 26, 1926, James L. Boyle, trustee in bankruptcy of Gordon, the individual, filed petitions in the two equity suits in the Maine court, asking to be allowed to bring suit in the United States District Court against Gillin and Weatherbee, as receivers of Gordon, Inc., and against them as receivers or custodians of the foxes in the Wentworth suit. November 5, 1926, the prayers of these petitions were denied. Boyle appealed to the law court of the state, which affirmed the decrees below.

October 26, 1926, the trustee in bankruptcy also presented petitions to the Maine court in the two suits there pending, setting out his appointment as trustee in bankruptcy of Gordon, the individual, and alleging that all the assets coming into the hands of the receivers or custodians of the court in either suit were claimed by the trustee as the property of Gordon, the bankrupt, and that all property of every kind received by them as receivers or custodians in either suit belonged to him as trustee of the estate of said Gordon, and requested that an order be entered requiring the receivers or custodians to turn over all assets by them received to him.

The prayers of these petitions were also denied, and appeals were taken to the law court. In the law court, these appeals were dismissed for want of prosecution, and the decrees below affirmed.

January 18, 1927, the trustee in bankruptcy filed in the United States District Court for Maine, sitting as a bankruptcy court, the two bills in equity brought under section 70e of the Bankruptcy Act and above described, praying, in the suit in which Herbert Gray is made a party defendant, that he be ordered to account for all property purchased by him from the receivers of Gordon, Inc., and from the receivers under the Wentworth bill, and praying in the other suit, in which Gillin and Weatherbee were made parties defendants, that Gillin and Weatherbee, both as receivers of Gordon, Inc., and as receivers or custodians under the Wentworth bill, be ordered to turn over to the trustee all assets and money received or held by them in either capacity.

The main allegations in these bills were that on or about January 1, 1925, and for some time prior thereto Gordon, the individual, was insolvent in both the common-law and the bankruptcy sense; that with the intent of hindering and delaying and defrauding his creditors he transferred on or about that date all of his property to Gordon, Inc., of the value of upwards of $1,000,000; that Gordon, Inc., was not a purchaser in good faith and for a present fair consideration, and that its title thereto was merely colorable; that the transfer was fraudulent and void as against the creditors of Gordon and the complainant; that Gordon, Inc., was the alter ego of the defendant Gordon, and a mere shield; that Gillin and Weatherbee were appointed receivers in the state court in the action brought against Gordon, Inc., and were receivers or custodians of the state court in the proceeding brought by Wentworth; that as such receivers and custodians they took possession of all the assets of Gordon, the individual, whether standing in his name or in the name of Gordon, Inc., including real estate, personal property, and foxes, numbering 3,000; that Gillin and Weatherbee, as receivers and custodians, as aforesaid, subsequent to the date of the filing of the petition in bankruptcy against Gordon and with knowledge thereof purported to sell all of said assets to the defendant Gray, and that Gray had notice of the pending bankruptcy proceeding; that Gillin, Weatherbee, and Gray all had notice that it was claimed that said property was owned by Gordon, and that the transfer to Gordon, Inc., was colorable and fraudulent; that the Maine court was without jurisdiction to order the sale subsequent to the filing of the petition in bankruptcy; that the sale to Gray was null and void, as being made subsequent to the petition in bankruptcy, when the property was in custodia legis and exclusively in the control of the bankruptcy court; that Gray had notice that the title to the property which he had purported to purchase was in Gordon and that the transfer to Gordon, Inc., was in fraud of creditors; that the proceedings in the state court against Gordon, Inc., and under the Wentworth bill, were commenced within four months of the filing of the petition in bankruptcy, and were nulli-

12

fied by the adjudication in bankruptcy; that the United States District Court had exclusive jurisdiction over the property in question, and an exclusive right to try the title thereto; and that the complainant, after qualifying as trustee, made a demand upon Gray for the property in question.

The defendants in both suits, reserving all rights to object to the jurisdiction of the District Court to hear either cause, and without consenting thereto, filed answers, in which they set up three distinct pleas. In the first plea, after setting out the proceedings in the state court and what had been done thereunder, it was averred that the receivers at the time of their appointments and ever since continuously claimed title to all of the property adversely to Gordon, the individual; that Gray having obtained title by valid decrees in the Maine court to all the property purchased by him, held the same adversely to Gordon; that the Maine court was and is a court of competent jurisdiction to try all questions raised by the bill, and that the United States District Court did not have exclusive jurisdiction to determine any of the questions; that the Maine court having first acquired jurisdiction by taking possession of the property, the federal District Court could not interfere with that possession or collaterally attack the validity of its decrees, but that said trustee must institute any suit to establish title to the property in question in the state court. In the other two pleas they set up the facts heretofore related with regard to the appearance of Boyle, the trustee in bankruptcy, in the two state court proceedings; his petitions alleging ownership of the property in the hands of the receivers or of the custodians; his requests for leave to sue the receivers in the federal court; the decrees of the Maine court entered on his petitions, and that by reason thereof the question of title raised by the plaintiff's bills had become "res adjudicata."

The answers, after admitting the formal allegations of the bills, denied the allegations as to jurisdiction, and all the allegations of the bills bearing upon the merits of each case.

When the cases came on for trial in the District Court, the defendants renewed their objections to the court's jurisdiction.

At the time of the sale of the fox business, and the property used in connection therewith, on December 31, 1924, by Gordon to Gordon, Inc., an audit of the books kept by Gordon in his business showed that Gordon had to his credit in the bank $22,656.76, that his total assets were $777,148.49, and his

liabilities $145,055.51; that these were his actual not contingent liabilities; and it appeared in testimony that Gordon, just prior to the transfer to the corporation, was able to pay and was paying his obligations as they became due in the regular course of business. The evidence also showed that, after Gordon, Inc., purchased the fox business and property on December 31, 1924, it took possession of all the property and business, and that the deeds of the real estate were recorded January 15, 1925; that thereafter the corporation conducted the fox business, sold some 250 or 260 foxes for $250,000 or $260,000, made renewal ranching agreements with prior contract holders of foxes, bought real estate, and gave mortgages on its real estate for substantial sums; that in January, 1925, the first month after its organization, it paid current expenses of the corporation amounting to $36,754.07, and paid $67,739.48 to satisfy obligations of Gordon, the individual, previously contracted by him in the conduct of the fox business; that in February, 1925, it paid out for current expenses of the corporation $40,000 and $36,000 on the obligations of Gordon, the individual, which he had previously incurred in that business; that in March, 1925, it paid current expenses of the corporation amounting to $40,000 and $30,000 of the obligations of Gordon, the individual, previously incurred by him in the fox business; that in April, 1925, it expended $32,948.22 in carrying on the business, and in May, 1925, $22,368.77 for like purpose; that the assumed obligations of Gordon, the individual, were entered in the books of the corporation as its obligations of January 1, 1925, and were paid promptly so long as it had money to do so; and that on October 24, 1925, the outstanding obligations (apart from a note on which there was a balance owing of $50,000 or $60,000) were about $29,000, practically all of which were debts created by the corporation. These figures, however, do not include conditional liabilities (those arising out of the guaranty contained in the contracts), created either by Gordon or Gordon, Inc., under the sales contracts for foxes. In other words, by October 24, 1925, when the receivership was applied for in the state court, the obligations of Gordon, the individual, created by him in connection with the fox business, had practically all been paid by Gordon, Inc., except a note of his given for foxes, on which there was owing a balance of between $50,000 and $60,000.

A study of the case discloses that according to the plaintiff's bills he claims title, not

only to the real estate and personal property included in the sale by Gordon to Gordon, Inc., on December 31, 1924, but to all the foxes sold by Gordon under sale contracts prior to December 31, 1924, and which Gordon did not claim title to or purport to transfer to Gordon, Inc., under the sale of December 31, 1924, and to all the foxes (250 or so) which he did transfer December 31, 1924, to Gordon, Inc., and which it thereafter sold to contract holders; and that he seeks to support his claim of title on two theories: (1) That Gordon, Inc., was a mere alias or agency under which Gordon, the individual, transacted business, or that it was a mere sham, organized in fraud of creditors, and should not be regarded as an independent entity, and in either case the property in its possession at the time the proceedings in the state court were brought was the property of Gordon, the individual; and (2) if Gordon, Inc., was not a mere alias or sham, but an independent entity, to which Gordon by his contract of December 31, 1924, transferred title to the property, that the transfer was without consideration and voidable as against creditors of Gordon and the plaintiff, the trustee in bankruptcy, on the ground that it was made when he was insolvent, with the purpose and intention of hindering, delaying, or defrauding his creditors; that on either theory the property transferred to Gordon, Inc., was the property of Gordon, the bankrupt; that its possession and that of the state court receivers was of right his; that the bankruptcy court, upon the filing of the bankruptcy petition, acquired constructive possession of the property and exclusive jurisdiction to determine the title and rights of all parties thereto or therein; and that this was true at least as respects the real and personal property in the possession of the receivers under the Gordon proceeding against Gordon, Inc., because the application by Gordon, if insolvent, to the Maine court for a receiver of the property, if it was his property, occurred within four months before the filing of the petition in bankruptcy, and was an act of bankruptcy, which by construction operated to nullify any lien against that property created by the receivership proceeding.

There are no allegations in either bill wherein it is asserted that the sale by Gordon to Gordon, Inc., was invalid under the Maine Sales in Bulk Act, nor are any facts alleged therein upon which to predicate the application of that act, although it was claimed at the trial that the act was applicable to that sale.

In the District Court it was found that Gordon, Inc., was not the alter ego or agent of Gordon, the individual, nor a mere sham, but was an independent entity, created without fraud, and following the sale and purchase of December 31, 1924, was generally recognized as such; that it conducted a substantial business, kept independent accounts, sold a large number of foxes, bought supplies, paid current bills incurred by it of a large amount, paid practically all the bills incurred by Gordon, while conducting the fox business, including his notes, with the exception of a balance due on one, bought real estate, made renewal ranching agreements with old contract holders, and gave several mortgages on its real estate, all as heretofore set out. We think the finding that the corporation was an independent entity, created without fraud, was warranted by the evidence, and approve it. It, and the evidence on which it is based, undoubtedly show that, so far as the question of independent entity is concerned, the character of the adverse claim of title by the defendants to the property in their possession at the time of the filing of the bankruptcy petition, their adverse claim was not merely colorable, but substantial.

The District Court also found (1) that the sale of December 31, 1924, from Gordon to Gordon, Inc., was not made without consideration, as alleged in the plaintiff's bill; that as consideration for the transfer Gordon, Inc., paid to Gordon its capital stock of $300,000, assumed all of his obligations, actual and contingent, incurred in the fox business, listed all of his actual indebtedness on its books as its own, and paid all of the same in the regular course of business, except a disputed bill or so, and the balance of a note, as above stated; (2) that the transfer was not made with the purpose and intent of hindering, delaying, or defrauding Gordon's creditors; that the transfer of the land was recorded in the public records on or about January 15, 1925, some 11 months before the petition in bankruptcy was filed; that no creditor ever attacked the conveyance, and while the transfer might have tended to hinder and delay Gordon's creditors, in the sense that they were not direct creditors of Gordon, Inc., the "creditors of Gordon were taken care of in the fullest way by the corporation," which assumed his obligations and paid all his bills, except one or two that were in dispute.

It is true that a transfer for a valuable consideration, if made with the purpose and intent to hinder, delay, or defraud cred-

itors, may be avoided at their instance, if the transferee is aware of the intended fraud; but in such case the fraudulent intent must be proved. Wilson v. Spear, 68 Vt. 145, 34 A. 429, and cases there cited. And that a voluntary conveyance, one without valuable consideration, if made with the purpose and intent to defraud creditors, may be avoided at their instance, without regard to knowledge by the transferee of the intended fraud. Laughton v. Harden, 68 Me. 208; Wilson v. Spear, supra. That, when the transfer is made with the intent of defrauding creditors, the consideration paid or the condition of the transferror's estate are immaterial. Wadsworth v. Williams, 100 Mass. 126, 130; Wilson v. Spear, supra. And it is also held that a transfer, with or without valuable consideration, may be avoided by creditors, if on the facts found or conceded the transfer must necessarily result in hindering, delaying, and defrauding creditors. For on such a state of facts no other inference is warranted than an intent to defraud. The only difference, when the evidence is conflicting, is that the trier of fact must draw the inference of intent. But in either case the fraud found is actual, not constructive. Gardiner Sav. Inst. v. Emerson, 91 Me. 535, 40 A. 551, 552; French v. Holmes, 67 Me. 186; Weeks v. Hill, 88 Me. 111, 33 A. 778; Matthews v. Thompson, 186 Mass. 14, 71 N. E. 93, 66 L. R. A. 421, 104 Am. St. Rep. 550.

■■ But here the transferee paid as consideration its capital stock of $300,000, assumed all of the transferror's (Gordon's) indebtedness, listed it on its books as its indebtedness, and "in the fullest way" took care of and paid the bills outstanding against the transferror. Under these circumstances it can hardly be said that no other conclusion can be drawn than that the consideration given was not a valuable consideration, nor that the transfer must necessarily result in hindering, delaying or defrauding the creditors of Gordon. But we are not called upon to go to this extent in determining the preliminary question of the bankruptcy court's jurisdiction, for the situation presented by the evidence is such that the adverse claim of Gordon, Inc., and of its receivers to the property (real estate and personal property other than foxes) in their possession cannot be said to be merely colorable, rather than substantial. None of the findings of the District Court is to be disregarded unless clearly wrong. Its finding, that the controversy presented by the adverse claim of Gordon, Inc., and its receivers is substantial, was

right; for "an actual claim may be adverse and substantial even though in fact 'fraudulent and voidable,'" if the claimant's contention discloses "'a contested matter of right, involving some fair doubt and reasonable room for controversy,' * * * in matters either of fact or law." Harrison v. Chamberlin, 271 U. S. 191, 194, 195, 46 S. Ct. 467, 469 (70 L. Ed. 897). And unless "the preliminary inquiry [of the court to determine its jurisdiction] shows that * * * [the adverse claim] is so unsubstantial and obviously insufficient, either in fact or law, as to be plainly without color of merit, and a mere pretense," it is not "to be held merely colorable." Harrison v. Chamberlin, supra, 271 U. S. 195, 46 S. Ct. 469, 70 L. Ed. 897. In other words, an adverse claim is substantial and not merely colorable, if a question of law or fact is thereby presented raising a fair doubt as to its validity or invalidity, even though it may be in truth and in fact fraudulent and voidable.

If it be assumed, although neither of the plaintiff's bills contained allegations setting up the Maine Sales in Bulk Statute (Rev. St. c. 114, §§ 6, 7) that the question sought to be raised under it is properly here (which we doubt), we do not think that the District Court erred in ruling and finding that the applicability of the statute and its effect upon the transfer by Gordon to Gordon, Inc., presented a reasonable dispute. This is manifestly so as respects the real estate and personal property in the possession of the receivers of Gordon, Inc., and also true as respects the 250 or so of foxes transferred by Gordon to Gordon, Inc., under the contract of sale of December 13, 1924, for as to them the evidence shows that in the early months of 1925, and more than four months prior to the filing of the petition in bankruptcy, Gordon, Inc., sold these foxes to contract holders, who purchased in good faith and for value, and that these foxes were taken possession of by the receivers or custodians in the Wentworth Case, asserting a claim of title in behalf of the contract holders, before the bankruptcy petition was filed. In this situation it cannot be said that the adverse claim of the receivers or custodians in behalf of the contract holders to these foxes was merely colorable, and not substantial, even though the Maine sales in bulk statute might otherwise have been held applicable to such foxes, had Gordon, Inc., not sold them to bona fide purchasers.

As to the foxes sold to contract holders by Gordon prior to the transfer of his fox business to Gordon, Inc., on December 31,

1924, as well as to the foxes sold by Gordon, Inc., to contract holders after the transfer, all of which had been taken possession of by the receivers or custodians under Wentworth bill, the District Court evidently found that their claim of title, in behalf of the contract holders, was substantial, and not merely colorable, for he ruled that as to them "the jurisdiction of the state court is too obvious to require discussion." We agree with this conclusion. The defendants' evidence tended to show that all the foxes taken into the possession of the receivers, whether sold by Gordon or by Gordon, Inc., had been sold to contract holders for $2,000 a pair, who purchased in good faith; that each pair of foxes had been segregated and set apart to a contract holder, or set of contract holders, owning the whole of or shares in that particular pair of foxes; that originally they had been left in the possession of Gordon, and later were taken over by Gordon, Inc., for ranching purposes, and were held by Gordon before the transfer of December 31, 1924, as bailee, and by Gordon, Inc., after the transfer, also as bailee. If the foxes of the various contract holders subsequently became intermingled, so that the particular pair sold to a given contract holder or set of contract holders could not be identified, through the negligence or willful conduct of either bailee, the bailee did not thereby acquire title to the foxes. The contract holders would be the owners of the foxes as tenants in common.

It has been suggested that title to a fraction of a fox could not be transferred, and, as a considerable number of foxes had been sold where two or more persons owned fractions of a pair, that in such cases the title to the pair did not pass from Gordon or Gordon, Inc., as the case might be, to such contract holders. This contention is without merit, for, under section 6 of the Uniform Sales Act in force in Maine, a sale of an undivided share of a chattel may be had and the buyer becomes an owner in common with the owner or owners of the remaining share or shares. And such apparently is the common law. In Littleton on Tenures (1480) it is said:

"Sec. 319. Also, as there be tenants in common lands and tenants, etc., as aforesaid, in the same manner there be possessions and properties of chattels reals and personals."

"Sec. 321. In the same manner it is of chattels personals. As if two have jointly by gift or buying, a horse or an ox, etc., and the one grant that to which him belongs (of the same horse or ox) to another, the gran-

tee, and the other which did not grant, shall have and possess such chattels personals in common, etc."

See, also, Williston on Sales, § 146.

We think it is clear from the terms of the sales contracts and the acts of the parties that it was intended title to the foxes should pass to the contract holders according to their interests in a given pair of foxes, and that it did so pass, and that the District Court was right when it found and ruled that the claim of the receivers or custodians in behalf of the contract holders was substantial and not merely colorable. There is no allegation, claim, or proof that the title of the contract holders to the foxes, if they acquired title, was not in good faith and for a valuable consideration. On the contrary, the evidence shows that they paid a valuable consideration and acted in good faith.

The adverse claim of title to the foxes asserted by the receivers or custodians in behalf of the contract holders, and the adverse claim of title to the real estate and other personal property asserted by the receivers of Gordon, Inc., each being substantial, and not merely colorable, and the title under which these claims arose having been created more than four months before the petition in bankruptcy was filed, and therefore not nullified by it (Metcalf v. Baker, 187 U. S. 165, 174, 23 S. Ct. 67, 47 L. Ed. 122; In re Rohrer [C. C. A.] 177. F. 381, 383; Pickens v. Roy, 187 U. S. 177, 180, 23 S. Ct. 78, 47 L. Ed. 128), and actual possession being in the state court through its receivers and custodians at the time and since the petition was filed, the District Court as a court of bankruptcy did not have exclusive jurisdiction to determine the conflicting claims to the property, and the question is: In what court must the plaintiff, the trustee in bankruptcy, bring his plenary suits in order to test the merits of his claim?

It is well established that the federal District Court, as a bankruptcy court, has exclusive jurisdiction to try the merits of such questions in a summary or plenary proceeding, if it has actual or constructive possession of the property in question. Taubel, etc., Co. v. Fox, 264 U. S. 426, 433, 434, 44 S. Ct. 396, 68 L. Ed. 770; Orinoco Iron Co. v. Metzel (C. C. A.) 230 F. 40, 45. But where, at the time the petition in bankruptcy was filed, it did not have actual or constructive possession of the property, and has not since then had it, and the property is in the possession of an adverse claimant under a substantial claim, that court does not have exclusive jurisdiction to try the merits of the

claims to the property. Taubel, etc., Co. v. Fox, supra. It would, however, have concurrent jurisdiction to entertain a plenary suit embodying a controversy over property in the possession of a third party having the right of possession, where the nature of the controversy was such as is contemplated by the provisions of section 70e of the Bankruptcy Act, but would not have even concurrent jurisdiction, if at the time of the filing of the bankruptcy petition the property was in the possession of some other court of competent jurisdiction, or its officers, having the right of possession. Taubel, etc., Co. v. Fox, supra.

▇▇ When a trustee in bankruptcy is required to bring a plenary suit, under section 70e or otherwise, to test a claimed right or title to property, resort must be had to the court having actual custody and right to the possession of the res. Lion Bonding Co. v. Karatz, 262 U. S. 77, 88, 89, 90, 43 S. Ct. 480, 67 L. Ed. 871; Murphy v. Hofman Co., 211 U. S. 562, 569, 29 S. Ct. 154, 53 L. Ed. 327; Mueller v. Nugent, 184 U. S. 1, 15, 22 S. Ct. 269, 46 L. Ed. 405. For such court has exclusive jurisdiction to determine all rights thereto or therein. And its determination of those rights cannot be questioned collaterally in the federal courts. Lion Bonding Co. v. Karatz, supra, at page 90, 29 S. Ct. 154, 53 L. Ed. 327; Kline v. Burke Const. Co., 260 U. S. 226, 229, 235, 43 S. Ct. 79, 67 L. Ed. 226, 24 A. L. R. 1077.

▇▇ As the trustee in bankruptcy did not at the time of bringing its plenary suits in equity have "the right of possession" to the property, and the Maine court, a court of competent jurisdiction, "at that date, and also at the time of the filing of the petition in bankruptcy, was entitled to possession and had possession," the District Court, as a court of bankruptcy, was without jurisdiction, exclusive or concurrent. First National Bank v. Title & Trust Co., 198 U. S. 280, 281, 25 S. Ct. 693, 49 L. Ed. 1051 (a summary proceeding); Whitney v. Wenman, 198 U. S. 539, 552, 25 S. Ct. 778, 49 L. Ed. 1157 (a plenary suit). And this is as true since the amendments to the Bankruptcy Act of 1903, 1906, and 1910, as previously when the two above-cited cases were decided, for those amendments did not extend the concurrent jurisdiction of the bankruptcy court to controversies where the possession and right of possession were in another court of competent jurisdiction at the time the bankruptcy petition was filed and when the plenary suit is brought.

Under the facts here found the District Court did not have jurisdiction, exclusive or concurrent, to entertain these suits, and they were properly dismissed for that reason.

In each case the decree of the District Court is affirmed, with costs to the appellees.

ANDERSON, Circuit Judge (dissenting). My construction of this record is so radically different from that presented in the majority opinion that I am constrained to a pretty full restatement of the facts and issues as I see them. The main question in these cases is whether the bankruptcy court or the state court of Maine has jurisdiction to liquidate the insolvent fox business of the bankrupt Frank H. Gordon.

Gordon was a dentist in Bangor. In 1922, he began the business of raising silver black foxes and the issuance of contracts executed in duplicate and running as follows:

"Article I. Said party of the first part (Gordon), in consideration of two thousand dollars ($2,000) to him paid by the party of the second part, the receipt whereof is hereby acknowledged, hereby sells and delivers to the party of the second part one pair of silver black foxes, warranted to be free of incumbrances and to be in good, healthy condition.

"Article II. Said party of the first part hereby agrees properly to ranch said foxes according to his regular system of ranching from the date hereof to the date of the birth of the first offspring of said foxes after the first breeding season following the date hereof, and said pair of foxes and said offspring from the date of their birth to the 1st day of January next, following: Provided, however, that this provision shall apply to said offspring only to the date of purchase thereof, if the right to so purchase provided for in article V shall be exercised by the party of the first part as therein provided, without further expense to the said party of the second part and for said purposes is to have sole possession of said foxes undisturbed by said party of the second part during said season.

"Article III. Said party of the first part hereby guarantees 100 per cent. production of offspring; that is, two offspring for the first breeding season next following the date hereof, and if less than two offspring are produced by said pair of foxes during said season said party of the first part shall supply young foxes of like kind and quality to make up said 100 per cent. production.

"All offspring produced by said pair of foxes during said season in excess of said

100 per cent. shall belong to said party of the first part.

"Article IV. In consideration whereof the said party of the second part has paid to the said party of the first part the sum of two thousand dollars ($2,000). Said party of the second part hereby agrees not to remove said pair of foxes, nor said two offspring from the possession of the said party of the first part, or in any way interfere with his said possession and ranching thereof for the time provided in this agreement.

"Article V. Said party of the second part hereby agrees that the said party of the first part shall have the right and privilege to buy from him, and he hereby agrees to sell free of all incumbrances to the said party of the first part, said two offspring hereinbefore described as soon as they shall be produced or supplied under the said guaranty, and to execute and deliver to him, said party of the first part, all conveyances necessary to carry out this provision, upon tender to him of the sum of fifteen hundred dollars ($1,500) by said party of the first part, and this option to purchase shall continue and be in force from the birth of said offspring up to January 1st next following."

Many of the contracts issued were for but fractions of pairs—even for one-twentieth of a pair, calling for but $100. The scheme as actually intended and operated did not, as Gordon's uncontradicted testimony plainly shows, contemplate "delivering any of the foxes." "The thing which seemed to worry my customers" most was the possibility that they might have to take delivery, which they "did not want." He continues:

"We didn't claim we were going to locate any fox, or mark or specifically identify the foxes in any way. It was not my intention to ever mark them, because it wasn't so good protection for my client. If they owned a specific pair of foxes, or expected to continue to own that specific pair of foxes, they must insure them. In case of death, I would have no authority to give them another pair of foxes. I had no obligation to give them any. But with my contract—my intention of simply keeping foxes enough to cover my contracts at all times, I considered a safer proposition would be for any investor to own, in reality, an undivided interest in the whole fox industry."

He also testifies that some of the pairs did not mate, but quarreled and had to be changed into other pens; that death—at times, epidemics—greatly reduced his stock; that he gave the perpetual guaranty of 100 per cent. "made out from year to year," referring to what was called the "renewal ranching agreements," said to have been made with the customer after his contract had run a year; no copy of such renewal agreement is in the record.

The real motive force back of the scheme is found in article V; the provision giving Gordon an option to buy the actual or supplied 100 per cent. reproduction for $1,500 a pair. He testifies: "As soon as we paid one or two customers the $1,500 which was the option price on the litter, they began to advertise the fox business, and * * * we met with very little sales resistance to selling all we could get to sell. * * *"

But he shortly discovered that under his management reproduction was only about 50 per cent.; consequently, in order to have foxes enough to cover the outstanding contracts and "have some stock in trade to sell at all times," he bought, at an average price of about $700 a pair, "in 1924, more than 1,000 pairs of foxes to take care of my sales and make up whatever shortage of reproduction there was."

His scheme, therefore, was to sell contracts at $2,000 a pair with a guaranty of 100 per cent. production, and to make up the deficit of about 50 per cent. by purchases at about $700 a pair, creating a market for more contracts of sale at $2,000 a pair by exercising the option to keep ("buy") at $1,500 a pair the actual or substituted reproduction. The earlier buyers of "an undivided interest in [Gordon's] fox industry" got a 75 per cent. return on their investment, and consequently became enthusiastic advertisers of it; it was essentially Ponzi's scheme of paying the earlier comers huge profits from moneys furnished by the later comers. Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873.

But the large purchases requisite to meet the guaranty, and the payment of $500,000 to $600,000 under the option provision, plus heavy expenses in ranching, feeding, and for overhead, shortly made Gordon insolvent; like most promoters of foolish and fraudulent schemes, he wasted much of his gettings —$90,000 on one newspaper for propaganda purposes, and in exorbitant commissions; in the later stages 50 per cent. to 60 per cent. to overcome "sales resistance."

In August, 1924, the state authorities investigated the enterprise and made a report. Then, under the advice of counsel, the form of the contract was changed, by striking out "and delivers," in the first article, in order to make the contract conform to the real intent of both parties and to the prac-

tice actually adopted, and by inserting a provision that the foxes should be "segregated and designated by number at some appropriate time during the life of this contract consistent with necessary breeding and ranching arrangements, reserving also the right to substitute other similar foxes for those thus designated, should ranching or breeding necessities demand such substitutes"; but this was never done. The time limit for the option in article V was also changed from one year from the date of the contract to read "from the birth of said offspring up to January 1st next following." A new article VI was added, here immaterial.

Late in 1924 Gordon, under the advice of counsel, formed the Maine corporation of Frank H. Gordon, Inc., and transferred his business and assets to it as of December 31, 1924. The directors were Gordon, his family, and nominees. He dominated and carried on the business, as he testified, precisely as before the incorporation, insisting that the directors "were to be distinctly dummy directors." All the stock ($300,000) was issued to Gordon. In form, the corporation took over his liabilities, and, assuming the validity of such assumption, was from the outset hopelessly insolvent, as was Gordon when he made the transfer. About $250,000 was taken in from new fox contracts after January 1, 1925. But shortly "sales resistance" became too strong to be overcome. In that winter (1924–25) an epidemic carried off many foxes. By October, 1925, Gordon's resources were so exhausted that the foxes were starving and eating each other; consequently he, as plaintiff, against Gordon, Inc., applied to the Supreme Court of Maine for a receiver. In his bill, he asserts failure of his effort to bring about a common plan among the holders of said contracts (he does not describe them as owners of foxes) for some equitable basis for reorganization, and the imperative necessity for immediate arrangements to provide food for the foxes. The answer, filed, of course, by procurement of Gordon's counsel, admitted everything alleged. The court appointed, October 26, 1925, the defendants Weatherbee and Gillin temporary receivers; they forthwith took possession of the ranches in Maine and efficiently fed and cared for the foxes. November 17, 1925, was, by the same decree, fixed as the date for hearing the question of making the receivership permanent, notice to be given by publication. On November 17, on bill and answer (no evidence), the receivership and injunction were made permanent;

the receivers were ordered to collect all assets of Gordon, Inc., to sell them at public or private sale, subject to the court's approval; claims against the corporation were to be filed with the clerk of court not later than March 23, 1926, notice to be given by publication.

Meantime, on November 2, 1925, one Wentworth, on behalf of himself and all other contract holders, brought a bill against Gordon, Gordon, Inc., and (by permission of the court) the receivers, alleging that title to all of the foxes then in the possession of the receivers was in the various contract holders, and not in any of the defendants; that the foxes had become intermingled and confused, so that the receivers could not identify those belonging to specific contract holders; and praying that the court would determine the rights and equities of all persons in respect to said foxes, and order distribution or other appropriate disposal thereof, meantime authorizing borrowing on receiver's certificates in order to provide food and care for the foxes. On answer admitting the allegations of the bill, the court took jurisdiction; and, on November 9, 1925, appointed Weatherbee and Gillin custodians to manage and care for the foxes in behalf of all persons in interest. This suit is limited to the foxes; it does not suggest court action as to other property.

On February 13, 1926, the Wentworth bill was taken pro confesso against holders of contracts described as nonappearing part owners; the custodians were appointed temporary receivers, and it was ordered that on April 5, 1926, "any person having probable interest in the property concerned may show any reason which may be made to appear to the court why there shall not be permanent receivership"—notice to nonresidents of Maine to be given as ordered on a motion (not before us) that nonresidents be made parties. Apparently this refers only to nonresident holders of fox contracts; there is nothing to show notice to general creditors, whose claims were very considerable.

On April 6, 1926, in the same suit, Gillin and Weatherbee were made permanent receivers, and ordered to take steps for a speedy close of the receivership. On July 22, 1926, on a petition of the receivers (not in the record), it was decreed that the foxes should be offered for sale at public auction on August 17 from the courthouse steps in Bangor, bids to be subject to confirmation by the court. For some reason not shown, this plan of a public auction sale was abandoned. On August 26, 1926, in the Went-

worth suit, the defendant Herbert Gray submitted to the court an offer of $300,000 for all the foxes, and, in the Gordon suit, of $50,000 for the real estate and personal property at Lincoln, Me., clear and free from incumbrances. Gray agreed in his offer that, after reserving 2 ranches out of 15 at Lincoln, to be selected by him, with all the foxes therein and the equipment thereon, he would "distribute the remaining foxes in that proportion to which they are entitled to all contract holders who within 30 days of the confirmation of the sale notify him of such election and pay him their just and equitable proportion of the purchase price of the foxes, plus any expenses, receivers' or otherwise, which he may have paid or incurred." These items amounted to about $67 a fox. He further agreed to "sell and convey at their fair proportionate value, based upon the entire purchase price, to any or all groups of contract holders entitled under the above offer to receive 300 or more foxes, such ranch or ranches and equipment as are needed to care for said foxes, provided, however, that the bidder may first retain sufficient ranches to properly accommodate all foxes that may not be taken by the contract holders under the above offer." Just what a "ranch" covered I do not understand. Parenthetically, what has become of ranches and foxes not at Lincoln, Me., cannot from this record be ascertained. Gordon testified that he had a ranch at Milbridge, Me., and another in Marlboro, Mass.

These bids were accepted and the sales confirmed. On October 4, 1926, the receivers reported that Gordon and Gordon, Inc., had sold and issued 4,270 contracts, of which 353 were canceled; that upon the date of their appointment there were outstanding 3,917 contracts, belonging to 2,600 owners; that the contracts then outstanding represented $2,841,315, and "in round numbers 2,841 foxes." What the additional $315 "represented" does not appear. By later decrees it was determined that various named assignees or purchasers of contracts were entitled to the rights of long lists of original owners of contracts, whose names and the numbers of their contracts were attached to such decrees. On January 13, 1927, a 6 per cent. dividend in cash was ordered on the face of approved fox contracts and paid to the amount of $136,557; checks for $21,546 more were held up because of these suits.

But on November 19, 1925, creditors had filed a petition in bankruptcy against Gordon, which the District Court dismissed on the ground that the claims relied upon were not liquidated. On appeal that ruling was reversed by this court. 12 F.(2d) 778. Adjudication followed, and the appointment of the trustee Boyle on October 15, 1926. Boyle, as trustee, promptly filed in both suits in the Maine court papers by which he "begs to inform this court" of the bankruptcy proceedings against Gordon, and Boyle's claim that "all assets coming into the hands of the receivers" belong to him as such trustee; that he therefore "requests or suggests that an order be entered," commanding the receivers to turn over all assets received by them. That court seems to have treated these papers as petitions; for it denied them by decrees November 5, 1926. Boyle also moved for leave to bring in the federal court a suit against the state court receivers; these motions were denied. Boyle filed, but did not prosecute, appeals; they were dismissed pro forma, for want of prosecution, December 21, 1926. No evidence was offered by Boyle in the Maine court; I find no order admitting him as a party in either suit.

On January 18, 1927, Boyle brought in the District Court for Maine these two suits (dismissed below), one against Gray, Gordon, and Gordon, Inc., and the other against Weatherbee and Gillin, receivers. Boyle's contentions are thus summarized by his counsel:

"(a) Title to the foxes never passed to the contract holders.

"(b) The transfer by Gordon to the corporation, was void as contrary to the Maine bulk sales statute.

"(c) The conveyance by Gordon to the corporation was, as to the trustee, a fraudulent conveyance as a matter of law.

"(d) The corporation was the alter ego and mere instrumentality of Gordon, and did not have a separate distinct existence.

"(e) By operation of the law the trustee was vested with all property of the bankrupt, whether transferred to the corporation or not.

"(f) Bankruptcy having intervened within four months from the date of the filing of the petition in the state court, exclusive jurisdiction was in the bankruptcy court, and such jurisdiction it cannot relinquish.

"(g) The defendants must account to the plaintiff for assets of the bankrupt coming into their hands."

The main contentions of all the defendants, raised by pleas and answers, are:

(1) The denial of Boyle's motions in the Maine court, followed by his failure to prosecute his appeals, were a final submission by him to the jurisdiction of that court.

(2) Possession of the res by the state court before the filing of the bankruptcy petition vested in that court exclusive jurisdiction to determine all rights therein.

I think it clear that Boyle's well-mannered suggestions to the Maine court were not an election to submit his rights and duties to that court, assuming that a trustee has, without authority from the bankruptcy court, the power to make such election. He did not ask to be made a party; he sought no process against any one; he framed no issue; he offered no evidence. His appeals to the law court were but an unnecessary extension of his suggestions for comity to the court of last resort, so as to give the Maine courts a considered opportunity to deal with that delicate question. Compare Harkin v. Brundage, 48 S. Ct. 269, 72 L. Ed. 457; Empire Trust Co. v. Brooks (C. C. A.) 232 F. 641. The federal court had, on such cases as are here pleaded, jurisdiction to collect the bankrupt's estate without obtaining any permission from the Maine court to sue its receivers. Miller v. Potts (C. C. A.) 26 F. (2d) 851. Creditors of a bankrupt estate are, in the language of the late Judge Sanborn, from the date of the filing of the petition cestuis que trust of the recoverable estate. Commissioners v. Hurley (C. C. A.) 169 F. 92, 94, 95. Their trustee cannot fritter away their rights (frequently to avoid preferences) by filing mere suggestions and requests in a state court, without issue tendered or evidence offered. Fidelity Co. v. Bray, 225 U. S. 215, 218, 32 S. Ct. 620, 56 L. Ed. 1055; In re Diamond's Estate (C. C. A.) 259 F. 70, 75; Martin v. Globe Bank (C. C. A.) 193 F. 841; Missouri v. Angle (C. C. A.) 236 F. 644, 652; In re Sage (D. C.) 224 F. 525; Bank v. Butler (C. C. A.) 282 F. 866; Hume v. Myers (C. C. A.) 242 F. 827, 830, 831; Union El. Co. v. Hubbard (C. C. A.) 242 F. 248; In re Hecox (C. C. A.) 164 F. 823; In re Grafton Co. (D. C.) 253 F. 668, 673, et seq.; Bank v. Murchison (C. C. A.) 213 F. 147, 150; 5 Rem. (3d Ed.) §§ 2084, 2116. The cases stand as they were before Boyle (in comity only) filed his suggestions in the state court.

The plaintiff's powers and duties accrued as of November 19, 1925, on the filing of the bankruptcy petition; it was a "caveat to all the world." Mueller v. Nugent, 184 U. S. 1, 14, 22 S. Ct. 269, 46 L. Ed. 405; May v. Henderson, 268 U. S. 111, 117, 45 S. Ct. 456, 69 L. Ed. 870, and cases cited. Gordon's transfer, as of December 31, 1924, while insolvent, to his corporation, was plainly in fraud of his creditors, even if there was no set purpose to deprive them of ultimate payment; enough that it would hinder and delay them. Empire, etc., Co. v. Practical, etc., Co. (C. C. A.) 20 F.(2d) 297, 298; Lovett v. Faircloth (C. C. A.) 10 F.(2d) 301, 304; Bank v. Trebein, 59 Ohio St. 316, 52 N. E. 834, and cases cited; Liller Building Co. v. Reynolds (C. C. A.) 247 F. 90; Graham Mfg. Co. v. Davy-Pocahontas Co. (C. C. A.) 238 F. 488; Glenn, Rights of Creditors, § 105, and cases cited. The parties must be held to have intended the natural and inevitable consequences of their acts; Matthews v. Thompson, 186 Mass. 14, 71 N. E. 93, 66 L. R. A. 421, 104 Am. St. Rep. 550, and cases cited; Bress v. Gersinovitch, 231 Mass. 565, 121 N. E. 525.

For present purposes, the corporation was but an instrumentality of Gordon's. Into the corporation went no new capital. As above noted, it became insolvent by the terms of the transfer. Prior to the incorporation he had obtained on this scheme approximately $2,500,000 from dupes, of which perhaps $500,000 had been paid to the earlier comers as dividends of 75 per cent.—paid in order to obtain more dupes and in no part from profits. The same scheme of fraud and folly, carried on by the same man, in the same way, with the same aggregation of assets and liabilities, went on after January 1, 1925, with new dupes putting in perhaps $250,000, about one-eleventh of the gross thus received. Compare In re Kornit Co. (D. C.) 192 F. 394, 396. It is plain that the right to equality of treatment of the first group of victims who had put in $2,500,000 before January, 1925, can be secured only through bankruptcy; equally plain that the right of the new group to like equality (all they are entitled to) can be secured by treating the corporation as a mere instrumentality of Gordon. The fiction of separate corporate entity cannot be allowed to destroy or impair the rights of either group.

The reasons given for the incorporation, and adverted to in the opinion of the court below, are not persuasive. The first is that it was to reduce income taxes. But, as Gordon's own testimony and the indisputable facts show that from the outset he had no real income, and so reported to the government, zero could not be reduced by incorporating his insolvency creating enterprise. The other reason, that various so-called customers wanted permanency for the scheme, is equally unconvincing. Permanency in a fox-breeding scheme, in which a leading factor was a guaranty of double the actual reproduction, is obviously absurd. As operat-

ed, the scheme was (as stated above) to pay the earlier comers large sums furnished by the later comers. Permanency was as impossible as perpetual motion. I regard it as almost too plain for argument that the incorporation was nothing but a device of counsel to avoid the (obviously inevitable) liquidation in the bankruptcy court. In April, 1924, the Supreme Court of the United States in the Ponzi Case (Cunningham v. Brown, supra, overruling this court in 284 F. 936) had held the preference provisions of the Bankruptcy Act (11 USCA) applicable, in order to work out approximate equality among the victims of such schemes. This result probably inspired counsel in the summer of 1924 to seek means to avoid a like result in liquidating this comparable scheme. The case is quite unlike that of the Chevaux Kid Case. Prince v. McLaughlin (C. C. A.) 16 F.(2d) 886. It is much more like such cases as Exploration Mercantile Co. v. Pacific Co. (C. C. A.) 177 F. 825; Stockton v. Central R. R., 50 N. J. Eq. 52, 24 A. 964, 17 L. R. A. 97; Higgins v. Cal. Pet. Co., 147 Cal. 363–369, 81 P. 1070; In re Holbrook Shoe & Leather Co. (D. C.) 165 F. 973; In re Berkowitz (D. C.) 173 F. 1012; Donovan v. Purtell, 216 Ill. 629, 75 N. E. 334, 1 L. R. A. (N. S.) 176; Booth v. Bunce, 33 N. Y. 139, 88 Am. Dec. 372; Chicago M. Co. v. Minneapolis Co., 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229; In re Muncie Pulp Co. (C. C. A.) 139 F. 546; In re Rieger Kapner & Altmark (D. C.) 157 F. 609; In re Kornit Mfg. Co. (D. C.) 192 F. 392; Clere Clothing Co. v. Union Trust Co. (C. C. A.) 224 F. 363; Hunter v. Baker Co. (D. C.) 225 F. 1006–1015; In re Looshen Piano Case Co. (D. C.) 261 F. 93; Kiendl v. Taunton (D. C.) 206 F. 509; Baker Motor Vehicle Co. v. Hunter (C. C. A.) 238 F. 894; Empire Lighting Co. v. Practical Co. (C. C. A.) 20 F.(2d) 295; Montgomery Web Co. v. Dienelt, 133 Pa. 585, 19 A. 428, 19 Am. St. Rep. 663; In re Slobinsky, [1913] 2 K. B. 517; 11 USCA p. 579, note 842; Wormser, Disregard of Corp. Fiction, pp. 47–85, and cases reviewed.

The whole record makes it clear that the incorporation was but a device to prevent the victims from obtaining their rights under the Bankruptcy Law. It ought not to be allowed to prevail.

In this connection significance attaches to the subsequent conduct of the receivers. The bankruptcy petition was filed, as above noted, on November 19, 1925. The receivers employed counsel on behalf of Gordon to contest it before the District Court, on January 22, 1926. That court, on March 3, 1926, dismissed the proceedings, on the ground that "the petition and the offers of proof did not make out provable claims in bankruptcy." On appeal, the case was argued in this court on April 13, 1926, also by counsel employed by the receivers. At that time practically no steps had been taken in the two state court cases—except highly appropriate steps to conserve the foxes, as to which the receivers seem to have been faithful and successful. Pending decision by this court on bankruptcy, the receivers on June 1, 1926, filed in the state court petitions for leave to sell the property. On June 12, 1926, this court's opinion was filed, holding that the bankruptcy petition must be heard on its merits. But the receivers pressed for a sale; and an interlocutory decree for a sale was procured by them on July 22, 1926, and the sale (or distribution) actually ordered in August, 1926, after mandate from this court on August 12, 1926. There was obviously set purpose by the receivers and all the counsel involved to put the property beyond the reach of the equality creating requirements —and other undesired limitations—of the Bankruptcy Act.

Comity plainly required that the status quo should be preserved, pending determination of the respective powers and duties of the state and federal courts. Cf. Hooks v. Aldridge (C. C. A.) 145 F. 865, 869.

I come now to consider the effect of the two receivership proceedings: Gordon's, under which, on October 26, 1925, he procured receivers of the foxes and all other property; and the Wentworth suit, of November 2, 1925, under which the same receivers were made custodians (and later receivers) of the foxes, on the theory that they (and all of them) were the property of contract holders, and belonged neither to Gordon nor to Gordon, Inc.

The Gordon suit is by the receivers correctly pleaded as brought "for the purpose of protecting and conserving the estate. * * *" But, even if we assume that it may (either with or without amendment) be regarded as a creditors' bill, involving ultimate liquidation, it is plain that it was superseded by bankruptcy within four months. Mere possession by a state court through a receivership does not exclude effective and possessive bankruptcy jurisdiction. Receiverships of insolvents (and both Gordon and Gordon, Inc., were insolvents) are now grounds for bankruptcy jurisdiction. It would be absurd to hold that Congress, under its paramount constitutional power

(Taubel v. Fox, 264 U. S. 426, 430, 44 S. Ct. 396, 68 L. Ed. 770), has left specific grounds for invoking bankruptcy so to operate as to leave the bankruptcy courts without power to administer in bankruptcy (Randolph v. Scruggs, 190 U. S. 533, 539, 23 S. Ct. 710, 47 L. Ed. 1165; Stellwagen v. Clum, 245 U. S. 605, 613, 38 S. Ct. 215, 62 L. Ed. 507; 5 Rem. §§ 2071, 2072, 2073; In re Conservative Co., etc. [C. C. A.] 24 F.[2d] 38; Scott v. Goodman [D. C.] 25 F.[2d] 175, 178. On this record, we need not consider any possible application of the rule laid down in Galbraith v. Vallely, 256 U. S. 46, 50, 41 S. Ct. 415, 65 L. Ed. 823.

Of course, Gray, who was conversant with the proceedings throughout, bought at his peril; he is not a bona fide purchaser without notice. Bank v. Sherman, 101 U. S. 403, 406, 25 L. Ed. 866; Bank v. Butler (C. C. A.) 282 F. 866; Diamond's Estate (C. C. A.) 259 F. 70, and cases cited; Eppley v. Baylor (C. C. A.) 293 F. 305, 310.

The conclusion that Gordon's attempted transfer of his business to Gordon, Inc., was voidable as in fraud of creditors, makes it unnecessary to discuss whether it was not also void under the Maine statute as to sales in bulk. R. L. Me. c. 114, § 6. It certainly is not clear that that statute is not applicable to a substantial part of the property, in form transferred by Gordon to Gordon, Inc.

The trustee seems to me clearly entitled to recover the property, or the value thereof, disposed of under the Gordon suit.

The closest and most important question in the case is: Did the Maine court, under the Wentworth suit, have jurisdiction, as against bankruptcy, to dispose of 4,600 foxes, worth, on this record, about $250 each— over $1,100,000? We must not fall into error by conceiving this question too broadly and inclusively; it is not a question whether jurisdiction was legally and wisely *taken* (under both suits) to conserve wasting property; nor whether in the Wentworth suit jurisdiction was properly assumed for examination of the claim of ownership in common; just as the jurisdictional basis may be examined in summary proceedings by the bankruptcy court. May v. Henderson, 268 U. S. 111, 116, 45 S. Ct. 456, 69 L. Ed. 870, and cases cited. The question is whether, on the undisputed facts, jurisdiction was legally *retained and exercised by the sale and distribution (both) of all of the foxes as the property of the contract holders,* and therefore no part of the estate of the bankrupt Gordon. To take, to conserve, to hold, pending determination of the truth of alleged jurisdiction-

al facts, are quite distinct from general administration, liquidation, and distribution, in quasi insolvency or bankruptcy. Under assignments for the benefit of creditors, the assignees legally and properly take, hold, and conserve the estate, but always subject to being superseded by bankruptcy. Randolph v. Scruggs, supra. Such assignees may not hastily liquidate and distribute, in order to escape "their legal duty to turn the property or its proceeds over to the trustee in bankruptcy." May v. Henderson, 268 U. S. 111, 116, 45 S. Ct. 456, 459 (69 L. Ed. 870). The duty of conservation receivers is the same.

We must not overlook that the general tendency of the amendments of the Bankruptcy Act during 30 years is toward extending the scope of the plenary or exclusive jurisdiction of the bankruptcy court, as an essential means of a nearer approach to achieving the ideals of the act—speed and equality. The amendments making receiverships of insolvents grounds of bankruptcy are remedial, obviously enacted to meet a demonstrated defect in the act, and are entitled to very liberal construction. Compare Taubel v. Fox, 264 U. S. 426, 44 S. Ct. 396, 68 L. Ed. 770, and notes; May v. Henderson, 268 U. S. 111, 45 S. Ct. 456, 69 L. Ed. 870; Bank of Dillon v. Murchison (C. C. A.) 213 F. 147, 150.

The adverse claim requisite to exclude possession and administration by the bankruptcy court must be real and substantial, in law or in fact. Harrison v. Chamberlin, 271 U. S. 191, 46 S. Ct. 467, 70 L. Ed. 897. This is important, for the initial situation, as disclosed by the Wentworth bill and answer, is quite different from that later disclosed by the undisputed and indisputable facts. In Wentworth's bill, filed November 2, 1925, he alleges that Gordon sold him between March 26, 1922, and August 14, 1924, five pairs of silver black foxes, for which he paid $10,000; that, at or subsequent to the execution of said contracts, Gordon set apart, segregated, and put in pens on one of his ranches the foxes sold under these contracts, and designated and entered them upon his books as Wentworth's property; that later Gordon, or Gordon, Inc., negligently or willfully intermingled and confused Wentworth's foxes with foxes belonging to other like owners, so that neither plaintiff (nor the receivers then in charge) could identify the foxes of Wentworth or of the other owners. The case thus presented, on bill and answer, to the state court, was of sales of full pairs, seasonably identified by the seller as the buyer's, and thereafter intermingled by the seller with

those of other buyers. The pleadings made a plain case of jurisdiction under R. S. Me. c. 82, § 6, or under general equity powers. When that court took jurisdiction and entered its interlocutory decree of November 9, 1925, appointing the receivers custodians of the foxes, there was nothing to show the issuance of contracts for fractions of pairs, or otherwise to control the allegation and admission that pairs of foxes had been segregated and identified as the property of Wentworth and other persons in like position, in whose behalf also the bill was brought —thus apparently creating a tenancy (or ownership) in common. Williston on Sales, c. 6, and particularly section 150 et seq., and cases cited.

Ten days later, when the bankruptcy petition was filed, the only parties before that court were a single investor, Wentworth, Gordon, his instrumentality, Gordon, Inc., and the court's receivers, holding for Gordon or Gordon, Inc., or for the contract holders as owners in common. It is important to note that nothing had then been done except to feed and save starving foxes and issue an order of notice to other contract holders. No lien or right, good against bankruptcy, could thereafter be created against Gordon's estate in bankruptcy, whatever it should prove to be; for that estate was then in custodia legis. Acme Co. v. Beekman, 222 U. S. 300, 32 S. Ct. 96, 56 L. Ed. 208. The bankruptcy petition assailed Gordon's scheme as a fraud ab initio, and thus gave the receivers actual as well as constructive notice that everything remaining of Gordon's gettings might in bankruptcy be held distributable to his victims on the basis of their net investments in his scheme—a result presumably not desired by Wentworth, one of the earlier investors.

On the return of an order of notice in February, 1926 (if not before), the facts appeared to be entirely inconsistent with the allegations and admission in the Wentworth pleadings. It then and subsequently appeared that a large proportion of the contracts were for but fractions of pairs; the investments ran from $100 up. A fraction of a pair of foxes cannot be "set apart and segregated," so as to pass title. An intent to pass title to a fraction of a pair is refuted by the evidence and the course of business. No contract holder testifies to the identification of a pair as his, or to intent to take title to a pair or to a fraction of a pair. This is highly significant. The undisputed and indisputable facts are that never, until near the close of 1924, after the bulk of the business had been done, was there even an attempt to identify contracts with pens, in which there might or might not be breeding pairs of foxes. But giving the same numbers to pens and contracts did not identify foxes; for, as Gordon, without contradiction, testified: "The pens simply had a number on them, and the foxes might be moved any time of the day or night, and no record sent to the office." And in addition to quarrels, divorces, and rematings, there were deaths, even epidemics, births, and large purchases, to make up the deficit under the 100 per cent. guaranty, as well as under his option. When Gordon (in form) transferred the business, etc., as of December 31, 1924, to the corporation, his books showed that he had foxes costing $84,600, in excess of the number then due contract holders under the 100 per cent. guaranty. At one time he had on the ranches foxes subject to (what he calls) a mortgage to the seller to secure part of the purchase money; of course, clear title to these could not pass under contracts. There were different grades of foxes. In Gray's bid, he stipulated that only one of the two ranches he was to reserve for himself should be of "first grade." Foxes are not fungible, at any rate when of different grades and paired for breeding purposes. The contracts themselves provided that his ranching and possession should not be interfered with. On Gordon's uncontradicted testimony, supra, it was the intent neither of himself nor any of his customers that title should pass. This alone would seem enough. 1 Williston, Sales, §§ 150, 258, 259. He, and not they or any of them, carried insurance and paid the local taxes on the foxes; no contract holder carried the risk of loss by death of any fox; no dead fox was ever charged to any contract holder. The theory of a real ownership, by the investors, of identified breeding pairs, required identification of the reproduction also; and, if less than 100 per cent., an identification of the pups of like kind and quality supplied by Gordon under his guaranty; and then, if he took up his option, an identification of the pups to which the option applied. None of these things were done. On the contrary (to recapitulate), Gordon had a shifting aggregation, of different grades of foxes, in thousands of pens, on various ranches, in two or three towns—mating, divorcing, breeding, dying, supplemented from time to time by purchases from without. He sold thousands of these contracts, and under his option paid the earlier contract holders 75 per cent. dividends out of the proceeds of the later sales of contracts. It seems to me impossible to

hold that title to any pair, or fraction of a pair, ever passed from Gordon to any contract holder. These investors had contracts, and nothing but contracts. Until the court took possession through its receivers and enjoined suits, clearly any creditor of Gordon might have attached and levied execution on any or all of the foxes; no contract holder could have successfully maintained replevin or conversion for any foxes thus seized for Gordon's debts. The plaintiff trustee is in the shoes of such a creditor. Bankruptcy Act, §§ 70a(5) and 70e (11 USCA § 110 (a)(5), (e).

I observe that learned counsel for the defendants in their briefs do not seriously urge the impossible proposition that title to this aggregation of foxes passed to the contract holders. On the contrary, they ground their defense on the two propositions that Boyle has finally elected the state court as his forum, and that the transfer to Gordon, Inc., created such an adverse interest as to exclude superseding bankruptcy jurisdiction, both of which propositions I think clearly untenable.

Adequately analyzed, the reasoning and decision of the Supreme Court in May v. Henderson, supra, rule this case. The court there reversed the Circuit Court of Appeals for the Ninth Circuit (289 F. 192), and held that the attempt of an assignee for the benefit of creditors to prefer the bank of which he was president, by permitting, before the petition was filed, a deposit to be applied to a note, could be dealt with on summary proceedings against the two assignees. The Supreme Court there held that the decision of the Circuit Court of Appeals that there was "nothing in the record to impeach the claim of the respondents that the bank claims the money by title adverse to them, and that the money is not now in their possession or under their control," was wrong, because merely colorable. Mr. Justice Stone, for a unanimous court, says, inter alia (268 U. S. 115, 116, 45 S. Ct. 458):

"Courts of bankruptcy do not permit themselves to be ousted of jurisdiction by the mere assertion of an adverse claim. The court has jurisdiction to inquire into the claim for the purpose of ascertaining whether the summary remedy is an appropriate one within the principles of decision here stated. * * * It may disregard the assertion that the claim is adverse if on the undisputed facts it appears to be merely colorable."

The adverse claim there held merely colorable was far more plausible in both law and fact than the claim here that title to these 4,600 foxes (old and young) had vested in 2,600 holders of these contracts, running from $100 to several thousands, and issued from 1922 to about July, 1925. Of the 4,600 foxes, about 1,800 were born in the spring of 1926, while the receivers were in possession. How, when, and to what contract holders did title to these 1,800 pass? An adverse claim so absurdly based as is this of ownership in the investors is not real and substantial. It is only dimly colorable, from the untrue allegations in the Wentworth bill, and because a respected court did not, sua sponte, end a jurisdiction invoked by what seemed to be the agreement of the great majority of the parties in interest. I am constrained to think that state jurisdiction so grounded cannot oust bankruptcy jurisdiction; that the possession of the foxes by the receivers under the Wentworth bill was for present purposes no more effective than the possession of the ranches, etc., under the Gordon suit; that both were superseded by bankruptcy within four months. 5 Rem. § 2067. Miller v. Potts (C. C. A.) 26 F.(2d) 851, and In re Diamond's Estate (C. C. A.) 259 F. 70, support my conclusions.

It follows that the insolvent estate accruing out of this scheme of fraud and folly was Gordon's bankruptcy estate, and should be so readministered as substantially to meet the requirements of the Bankruptcy Law, as was Ponzi's like estate. Cunningham v. Brown, 265 U. S. 1, 44 S. Ct. 424, 68 L. Ed. 873.

I do not discuss many questions which would inevitably arise in such readministration of the estate. We do not even know on what basis the bankruptcy court, after mandate from this court, proceeded in adjudicating Gordon bankrupt. But the petition before this court in 12 F.(2d) 778, alleges that Gordon obtained $4,100 from the petitioners fraudulently, and also that he made transfers in fraud of creditors and by way of preference. Clearly, the argument of fraud ab initio would be open to many, perhaps to all, of the investors. Gordon's transaction with the Waldo Trust Company is, by fair implication, an admission by him that the contracts were open to rescission for fraud. Contracts had been purchased by people whose notes for the money paid Gordon were discounted in this Trust Company, and who "afterwards found that the contracts were not worth what they thought they were." In order to protect the treasurer from liability or blame for discounting these notes, Gordon assumed the liability of the promisors to the bank and ordered their fox contracts can-

celed. Contracts financed by money from a bank are no more voidable for fraud than contracts financed by money of the dupes themselves. This is one of a substantial number of transactions, inadequately shown in this record, calling for critical examination in the bankruptcy court.

Again, the method of distribution adopted by the Maine court is plainly inconsistent with the rules applicable in bankruptcy. As I understand the proceedings (from the ill-arranged and inadequate copies of records in that court here presented), they went on the theory that all of the contracts outstanding were valid for their original face, without regard to the fact that the earlier investors must have received one or even two 75 per cent. dividends. For illustration: Wentworth had invested $10,000 as early as August, 1924. Inferentially, he must have received two dividends amounting to 150 per cent. on his $4,000 invested in 1922, or $6,000, and one dividend of 75 per cent. on $6,000 invested in 1924, $4,500, or $500 more than his aggregate investment. Yet he seems to have been treated precisely like the later comers, who had received nothing. If the Gordon scheme was a fraud ab initio, Wentworth was a preferred creditor, not a wronged owner of five pairs of foxes.

Again, Gray offered $300,000 for all the foxes, 4,600, on condition that he allow the contract owners, who were reported to be entitled to 2,841 foxes, to have 2,841, paying therefor in cash at the same rate, about $67 a fox. This apparently resulted in giving him about 1,800 foxes, worth on this record about $450,000, for less than one-third of that sum, and the ranches and other property went in large, but unascertainable, part to Gray, with a right of participation in the distributee contract owners who came into this scheme of liquidation, leaving general creditors, with claims filed and apparently valid of over $70,000, no chance for any substantial dividend. Yet it was not even claimed that the contract holders had any title or other superior right in the ranches, etc., held under the Gordon suit.

Again, if the contracts were, as the Maine court seemed to hold, valid, they covered 100 per cent. annual reproduction, and not merely the original pairs or fractions of pairs. Most of them were issued in 1923 and 1924; on these there were at least two breeding seasons before the distribution or sale in the fall of 1926. If, under their contracts, they were originally entitled to 2,841 foxes, under the reproduction guaranty, they must have been entitled to this guaranteed progeny (5,682),

except as such right was cut down by Gordon's exercise of his option for perhaps 400 pairs. On this record I can see no foundation for distributing the foxes without regard either to the guaranty of 100 per cent. annual reproduction or to Gordon's payments under his option.

There is no indication that this mixed sale and distribution of the foxes and all other property was ordered after notice of this plan to the parties in interest and opportunity to object to Gray's extraordinary proposition; it seems to have been ordered in chambers, after the state court rejected bids submitted at the auction advertised.

In bankruptcy, the creditors would have the right to claim both a substantially different estate to distribute and a radically different theory of distribution.

The doctrine that prior possession of a res by a court of competent jurisdiction excludes jurisdiction by all other courts is not applicable. Plainly the state court of Maine is not a court of "competent jurisdiction" in bankruptcy. It has no jurisdiction to deal with preferences, almost certainly an important element in bankruptcy administration and liquidation of this estate, as it was in the Ponzi estate, in which, after decision by the Supreme Court of the United States, hundreds of preference suits were brought and sustained.

To apply broadly and literally the doctrine that prior possession, through its receivers, by a court of competent jurisdiction, excludes bankruptcy, would nullify the amendments of the act which expressly make receiverships of insolvents grounds of bankruptcy. Since those amendments, such receiverships have, as stated above, no more validity as against bankruptcy than assignments for the benefit of creditors. Miller v. Potts, supra; In re Diamond's Estate, supra; Rem. § 2070.

Doubtless (as the majority opinion holds), if the gist of the cases were suits to avoid transfers in fraud of creditors, the state court has concurrent jurisdiction with the federal court under section 70e of the act. Murphy v. John Hofman, 211 U. S. 562, 568, 29 S. Ct. 154, 53 L. Ed. 327; 5 Rem. Bankruptcy (3d Ed.) § 2042. But, rightly analyzed, the gist of these cases is not jurisdiction to recover for the bankruptcy estate property conveyed in fraud thereof. The gist is whether the state court has exclusive jurisdiction to administer and liquidate, without regard to bankruptcy, both receivership estates, viz. the ranches, etc., held under the Gordon receivership and all

26

of the 4,600 foxes held under the Wentworth receivership. State court concurrent jurisdiction under section 70e is in aid of appropriately invoked bankruptcy jurisdiction. The attempt here is to pervert it into a nullification of the right of creditors to have administration and liquidation in bankruptcy of any part of Gordon's gettings from his dupes.